IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES ROBERT TICE,
     Petitioner

v.             CIVIL ACTION NO. 03-9 ERIE

HARRY E. WILSON, Warden,
     Respondent

EVIDENTIARY HEARING

Proceedings held before the HONORABLE

SUSAN PARADISE BAXTER, U.S. Magistrate Judge,

in Judge's Chambers & Courtroom B,

U.S. Courthouse, Erie, Pennsylvania,

on Wednesday, September 7, 2005.

APPEARANCES:
        THOMAS W. PATTON, Assistant Federal Public
        Defender, appearing on behalf of
        the Petitioner.

MICHAEL BURNS, Assistant District Attorney
of Erie County, appearing on behalf of
the Respondent.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3     WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PETITIONER:

5  Judith Tice              5    16    26    28

6  Karen Jaworski          29    40    53    --

7

8

9               - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1            P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 10:15 a.m., on

4    Wednesday, September 7, 2005, in Judge's Chambers.)

5

6            THE COURT:  Before we go in the courtroom, I just

7    wanted to go over -- I have the judge's order.  It's my

8    understanding we're only going to do the extra testimony of

9    Judy Tice and Karen Jaworski, and perhaps take some more

10   argument on where you think this testimony takes us.  We're not

11   going to reopen all the evidentiary hearing, is that your

12   understanding as well?

13         MR. PATTON:  Yes.

14         THE COURT:  You're not planning on putting Mr. Tice

15   back on the stand or any of that sort of thing?

16         MR. PATTON:  No, ma'am.

17         THE COURT:  You have nothing planned on your own,

18   other than cross-examining these two women?

19         MR. BURNS:  Correct.

20         THE COURT:  Is there anything you guys would like to

21   discuss before we get out there?

22         MR. BURNS:  Judge, I'm going to request that the

23   witnesses be sequestered.

24         THE COURT:  That's fine.

25         MR. PATTON:  We're going to call Judy first, and

4

1    then Karen.

2          THE COURT:  Which one came from Florida?

3          MR. PATTON:  Karen.

4          THE COURT:  Does she have a flight back today?

5          MR. PATTON:  Yes, it's at 4:00 or 4:30.

6          THE COURT:  All right, then we're ready to go.

7          (Discussion held off the record.)

8          (Whereupon, at 10:18 a.m., the proceedings recessed

9   in Judge's Chambers; and at 10:30 a.m. began in Courtroom B.)

10          THE CLERK:  The case before the court is James

11   Robert Tice versus Harry E. Wilson.  It's docketed at Civil

12   Action No. 03-9 Erie.  Representing the petitioner is Thomas

13   Patton; representing the respondent is Michael Burns.

14          THE COURT:  Okay, we've all made it.  We're here on

15   order of the district judge to take testimony from the two

16   sisters.  That is your order in the first instance, Mr. Patton,

17   I will give you the floor.

18          MR. PATTON:  Yes, ma'am.  We would call first Ms.

19   Judith Tice.

20          THE COURT:  Ms. Tice, come up to this side and we

21   will swear you in.

22          THE CLERK:  Could you raise your right hand, please.

23          JUDITH TICE, PETITIONER WITNESS, SWORN

24          THE CLERK:  Thank you, please be seated.  Please

25  state your full name and spell your last name for the record?


                              5


1          THE WITNESS:  Judith Lynn Tice, T-i-c-e.

2          MR. PATTON:  Your Honor, pursuant to Mr. Burns'

3  request in chambers, the witness has been sequestered, Karen

4  Jaworski is now out of the courtroom.

5          THE COURT:  Thank you.  He did make that request on

6  the record in chambers.

7                   DIRECT EXAMINATION

8  BY MR. PATTON:

9  Q.   Judy, I'm going to have to ask you to keep your voice up

10  and speak into the microphone so that everyone can hear you.

11          THE COURT:  You can move the microphone closer if

12  you'd like.

13  BY MR. PATTON:

14  Q.   Judy, do you know Jim Tice?

15  A.   Yes.

16  Q.   How do you know Jim?

17  A.   He's my brother.

18  Q.    Okay.  I want to ask you some questions, Judy, about

19  events that occurred in 1997, okay.  Now, back at that time do

20  you know where your brother was?

21  A.    Hermitage House.

22  Q.    Was that a result of juvenile placement there through the

23  juvenile court system?

24  A.    Yes.

25  Q.    Had you had contact with Jim throughout his different

6

1  placements while he was in juvenile probation?

2  A.    Yes.

3  Q.    Before Jim was placed at Hermitage House, did you have

4  contact with Jim while he was at a place called STS or

5  Specialized Treatment Services?

6  A.    Yes.

7  Q.    Did Jim have home visits with you while he was at STS?

8  A.    Yes.

9  Q.    Did he then continue to have home visits with you when he

10  was placed at Hermitage House?

11  A.    Yes.

12  Q.    Now, at the time Jim was at Hermitage House, where were

13  you living?

14  A.    238 Snyder Circle, Corry, Pennsylvania.

15  Q.    Who were you living with?

16  A.    Myself and my son.

17  Q.    What's your son's name?

18  A.    David Hunter.

19  Q.    And how old was your son back in '97?

20  A.    Five-years-old.

21  Q.    When you started having the home visits or Jim started

22  having the home visits with you from Hermitage House, could you

23  explain to the court the procedure you would have to go through

24  in getting Jim to your home?

25  A.    Usually, Jim would call and see if he was able to come


7


1  home that particular weekend.  And if I had to work, he wasn't

2  able to.  And if I didn't have to, then I gave him permission.

3  And my fiance and my son and I would go and pick him up.

4  Q.    You and your fiance would physically go to Hermitage

5  House to pick Jim up?

6   A.   Yes.

7   Q.   When you would go to Hermitage House to pick Jim up, what

8   would you have to do when you got there?

9   A.   When we got out of the vehicle, we went to the home and

10  usually rang the bell and staff would let us in.  And talk to

11  the staff for a few minutes, sign him out, and give him an idea

12  of when he'd be back.

13  Q.   You mentioned that you would have to talk with the

14  Hermitage House staff and then sign him out?

15  A.   Yes.

16  Q.   Are you talking about signing Jim out?

17  A.   Yes.

18  Q.   During that process were there certain rules that were

19  explained to you that Jim would have to follow through the

20  course of the home visit?

21  A.   Yes.

22  Q.   How would that happen?

23  A.   I think like on the first time that he came, they

24  explained them to us.  And then kind of when he left the home,

25  they would remind him, well, you know, Jim, you have to be

1  respectful, you have to follow the bedtime, you know, like the

2  staff would say you have to do, and he did.

3  Q.   Was there anything you had to sign regarding Jim coming

4  to your house and you making sure Jim followed the rules?

5  A.   Yes, there was, I believe it was like a rule of conduct

6  or whatever it being, yes, we did have to sign that the initial

7  visit.  The staff went over that with us.  But then, excuse me,

8  like I said, then usually after that if we went to get him,

9  they would, you know, casually remind him, you know, Jim, you

10  have to do this.  And he would be okay with that.

11  Q.   Okay.  So the first time Jim came, you had to sign this

12  rules of conduct or contract or whatever it was called, is that

13  correct?

14  A.   Yes.

15  Q.   And that document set forth the rules that you and Jim

16  would have to follow?

17  A.   Yes.

18  Q.   Was there any requirement or rule regarding what your

19  responsibility or responsibilities were?

20  A.   Yes, my responsibility with Jim, basically, was to be

21  with him when he was with me.  When we signed him out, I was

22  responsible for Jim.  It couldn't be my fiance, any other

23  relative, he was to be with me, and that's how it was.  Until

24  he was signed back in the facility, usually on Sunday night.

25  Q.    Now, you said you had to do that the first time that

9

1  there was a home visit.  Did you also have to sign Jim out?

2  A.    Yes.

3  Q.    And the requirement of signing Jim out, did that apply

4  for every home visit?

5  A.    Yes.

6  Q.    So is it accurate to say that every time you would go to

7  pick Jim up at Hermitage House to take him to your house for a

8  home visit, you physically had to sign something saying that

9  Jim was coming to you?

10  A.    Yes.

11  Q.    After you guys would sign all that stuff, would you then

12  go back to your house?

13  A.    Usually we went back to my house or we might stop, go out

14  for supper.  Or, you know, and talk about the weekend, what

15  activities or what we were going to do.

16  Q.   Did you take the requirement that Jim had to be

17  supervised by you during the home visit seriously?

18  A.   Yes.

19  Q.   Why?

20  A.   Basically, if I'm signing my signature to be responsible,

21  I'm going to be responsible.

22  Q.   Did you follow that rule and supervise Jim during the

23  home visits he had to your house?

24  A.   Yes.

25  Q.   Could you just give us an example of some of the steps

10

1  you would take to make sure that Jim was with you?

2  A.   I would make sure he was safe.  Usually I would check a

3  couple times at night, check and make sure he was sleeping,

4  like I do with my own son, and he was.  I didn't go to sleep

5  until I made sure like my son was sleeping in his room and Jim

6  was sleeping on the couch or whatever.  I made sure I knew his

7  whereabouts at all times.  That he, of course, didn't play with

8  any hazardous materials or anything.  Basically, just made sure

9   everybody was safe and tried to be as responsible as possible.

10   Q.   Now, you mentioned something about the sleeping

11   arrangements you had, I just want to go over those again.

12   Where in the house would you sleep?

13   A.   I slept in my bedroom.

14   Q.   Do you have a two-story house or a single story?

15   A.   At that time this was an apartment and it was two

16   stories.

17   Q.   Okay.  Was your bedroom on the second story?

18   A.   Yes.

19   Q.   Where did your son sleep?

20   A.   My son slept either in his room or on the floor in my

21   room.  I would give Jim the choice if he wanted Stevie's room

22   or if he wanted to sleep on the couch.  The couch being on the

23   first floor.  And then if Jim slept in my son's room, my son

24   was small then, he slept on my floor.

25   Q.   You mentioned that you would not go to sleep until after


11


1   you made sure Jim was asleep?

2   A.   Correct.

3  Q.   And then would you check on Jim through the course of the

4  night?

5  A.   Yeah, with a few insulin problems, I get up during the

6  night anyhow and use the restroom.  So I would go down and make

7  sure he was sleeping and use the restroom, yes.

8  Q.   Would you do that regularly on every night that he would

9  stay at your house?

10  A.   Yes.

11  Q.   During any of the home visits Jim had with you, was there

12  a time where Jim left without your permission and you did not

13  know where he was?

14  A.   No.

15  Q.   On any of the home visits, did he ever leave your house

16  and go to your sister, Karen's house?

17  A.   No.

18  Q.   Now, at this time when Jim was at Hermitage House, you

19  testified you were living in Corry, correct?

20  A.   Yes.

21  Q.   And where did your sister, Karen, live?

22  A.   Uh -- West 27th Street in Erie.

23  Q.   During any of the home visits where Jim was supposed to

24  be at your house, did he come up missing and you get contacted

25   by Karen saying hey, he's over at my place?

12

1   A.   No.

2   Q.   To your knowledge, would Jim have had a means to get

3   himself from your house in Corry to Karen's house in Erie?

4   A.   Absolutely not.

5   Q.   At the end of the home visit when it was time for Jim to

6   go back to Hermitage House, how would he get back to Hermitage

7   House?

8   A.   My fiance, Jim, would take him back and myself and my

9   son, we all went together.  And then usually my fiance, Jim,

10   would carry in his suitcase and my brother, Jim, would go in

11   and say hello to everybody and we'd tell them how the weekend

12   went and signed -- basically, I signed my signature again to

13   sign him back in.

14   Q.   Okay.  Physically you would have to sign --

15   A.   Yes.

16   Q.   That you were bringing Jim back to the facility?

17   A.   Yes.

18   Q.   Would you speak to any of the staff at Hermitage House?

19   A.   Yes.

20   Q.   What would you guys talk about?

21   A.   Basically, we talked about Jim's behavior and how the

22   weekend went, what activities we did.  If he was respectful,

23   disrespectful.  Basically -- I don't know, sometimes they'd ask

24   him questions, what did you have to eat, you know, stuff like

25   that.  Just kind of like the lowdown on the weekend, I guess.


13


1   Q.   When Jim was at your house during the weekend, would

2   there ever be checks by Hermitage House to make sure that Jim

3   was really at your house?

4   A.   In recalling back, I believe that he had to call on -- if

5   he left on a Friday night, I believe he had to call Saturday

6   and if not, they would call and they would check on him.  But

7   usually he did place that call.  And then he would talk to them

8   and I would talk to them.

9   Q.   So during this call -- this was either a call that Jim

10   would place to Hermitage House, is that correct?

11   A.   Yes.

12   Q.   Or if Jim did not call, Hermitage House would call?

13   A.   That was what they would do.  But I don't think that was

14   ever the case, sometimes I even dialed the phone and handed it

15   to Jim so he could call and say hey, I'm at my sister's house,

16   everything is going well.  And then I would go and get on the

17   phone and talk to them and that would be it.

18   Q.   So during these telephone calls you personally would

19   speak to someone from Hermitage House to confirm that Jim was

20   there?

21   A.   Yes.

22   Q.   Was there only one call or were there multiple calls

23   during the weekend?

24   A.   One.

25   Q.   Did Hermitage House -- during the weekend when Jim was

14

1   supposed to have a home visit to your house, did Hermitage

2   House ever call and Jim not be there?

3   A.   No.

4   Q.   Did Hermitage House ever call and say we're trying to

5   find Jim, we don't know where he is, is he in your house?

6   A.   No.

7   Q.   During any home visit that Jim had to your house, did Jim

8   ever make his call in on Saturday, and he and you both speak to

9   Hermitage House to confirm that Jim was at your place, and then

10  Jim leave and go somewhere else?

11  A.   No.  If he went somewhere else, he went with myself.

12  Q.   Did he ever leave by himself and just go somewhere else?

13  A.   No.

14  Q.   Did Hermitage House or the staff at Hermitage House,

15  anyone there, ever express any concerns to you about Jim having

16  a home visit to your house because you had a young

17  five-year-old child in your house?

18  A.   No.

19  Q.   Did they ever express any concern about Jim being around

20  small children?

21  A.   No.

22  Q.   Did they ever say to you as part of the conditions of the

23  home visit that he was not to be around small children?

24  A.   Absolutely not.

25  Q.   If Jim were not to be around small children during the

15

1   home visits, would he have been able to come to your house for

2   home visits?

3   A.   No.

4   Q.   Did you ever have any disciplinary problems with Jim

5   during home visits?

6   A.   No.

7   Q.   Did you ever have any problems of any kind with Jim when

8   he would come on home visits?

9   A.   Not that I can think of.

10   Q.   And, again, was there ever any time when Jim left your

11   house without you and was gone from your presence?

12   A.   No.

13   Q.   After Jim was charged with the crimes that were related

14   to Jennifer Jaworski's allegations, were you ever contacted by

15   Jim's attorney, a gentleman by the name of Tony Logue or

16   Anthony Logue?

17   A.   Not that I can remember, no.

18   Q.   Have you ever made a statement to anyone ever, that when

19   Jim was supposed to be coming to your house on a home visit

20   from Hermitage House, he really was not coming to your house

21   but was instead going to Karen's house?

22  A.  No.

23        MR. PATTON:  May I have a moment, your Honor.

24        THE COURT:  Yes.

25  BY MR. PATTON:


                              16


1  Q.    Judy, was there ever a time where you weren't expecting

2  Jim to be at your house that he would just show up?

3  A.    No.  Jim usually called during the week, I believe it was

4  like a token economy or positive reinforcement, he would have

5  to earn that to call.  And usually he'd call like Wednesday or

6  Thursday to see and if I had to work, I told him, I'm sorry,

7  but I had work, he wasn't able to come to my house.  So usually

8  then he'd call like the next week and then if I had the weekend

9  off, usually I had every other week or every third weekend off

10  of work.  And if he was able to come, we went and picked him up

11  and took him back.

12  Q.    So he never just showed up at your doorstep?

13  A.  No.

14        MR. PATTON:  Those are my questions, your Honor.

15        THE COURT:  Cross-examination, Mr. Burns.

16    MR. BURNS:  Thank you, your Honor.

17            CROSS-EXAMINATION

18  BY MR. BURNS:

19  Q.    Ma'am, good morning, my name is Michael Burns, I

20  represent the Commonwealth and the District Attorney's Office

21  of Erie County, who are one of the respondents in this case.

22  I'm going to ask you a few questions now and if you don't

23  understand anything that I ask you, would you please tell me

24  and I will try to clarify it, okay, fair enough?

25  A.    Sure.


                            17


1  Q.    All right.  It's not my intention to upset you, I just

2  need to ask you some questions, okay?

3  A.    Sure.

4  Q.    Now, ma'am, as you indicated, Mr. Tice, Jim, is your

5  brother, correct?

6  A.    Yes.

7  Q.    And what's the age difference between you?

8  A.    Nine years.

9  Q.    Is it fair to say that you love your brother?

10  A.   Yes.

11  Q.   All right.  You don't enjoy seeing him get in trouble, do

12  you?

13  A.   If he does something wrong, he needs to face the

14  consequences.

15  Q.   Your brother's in jail, correct?

16  A.   Yes.

17  Q.   He's been in jail for approximately six years?

18  A.   Something like that time.

19  Q.   That's got to be pretty upsetting to you, isn't it?

20  A.   Yes and no.

21  Q.   All right.  Why is it not upsetting to you?

22  A.   I feel if somebody has done something that is not fair,

23  then they need to face the consequences.

24  Q.   And do you feel that your brother did something for which

25  he needs to face the consequences?


                                18


1  A.   I -- I don't know.

2  Q.   But in some respects it is upsetting to you that your

3  brother is in a state prison, would that be a fair statement?

4    A.    I'm not really sure if that's fair or not because I'm

5    50-50.

6    Q.    50-50?

7    A.    Yeah, if somebody did something that they need to serve

8    the time, then they need to do it.  But yes, I do love my

9    brother.

10   Q.    Now, you stated on direct examination and in your

11   affidavit that your brother would get home visits with you,

12   correct?

13   A.    Yes.

14   Q.    All right.  And in your affidavit you said that he was

15   under your care and direction, correct?

16   A.    Yes.

17   Q.    You said he was at your residence every night?

18   A.    On the weekends that he came -- yes, he was there.

19   Q.    On the weekends that he was assigned to be at your house?

20   A.    That he got the privilege of a home visit and if I wasn't

21   working, then he was there.

22   Q.    So if you had to work that weekend, James would never

23   come to your house?

24   A.    No.

25   Q.    Was this during the entire year of 1997, if you know?

19

1  A.   I really can't clearly remember.

2  Q.   All right.  So you're really not sure what weekends

3  during what time period in 1997 James received home visits to

4  your house, correct?

5  A.   I couldn't say for sure.

6  Q.   Okay.  And you say you worked, is that right?

7  A.   Yes.

8  Q.   Where did you work and what hours did you work?

9  A.   I worked at Rebecca's personal care home in Corry,

10  Pennsylvania, and I only worked two to three days a week

11  part-time, and the hours varied.  I mean once in a while it was

12  days, sometimes it was second.

13  Q.   All right.

14  A.   Basically as needed.

15  Q.   And your testimony is that when James came to your house

16  for a home visit, you did not work at all during that entire

17  weekend?

18  A.   No, I didn't.

19  Q.   You did not?

20  A.   No.

21  Q.   You mentioned in your direct examination that you had a

22  fiance at that time, is that correct?

23  A.   Yes.

24  Q.   May I ask his name?

25  A.   James Willis.


20


1  Q.   And James, I take it, did not live with you at that time?

2  A.   He stayed occasionally.  His primary residence was being

3  with his grandmother, but he did stay sometimes.

4  Q.   Okay.  He would stay with you?

5  A.   Yes, sometimes he did.

6  Q.   And did he stay with you at times when James was staying

7  with you as well?

8  A.   Yeah, usually on the weekend my Jim stayed.  Like Friday,

9  Saturday, Sunday.

10  Q.   I'm sorry, when you say my Jim, you mean your fiance?

11  A.   Yeah, my fiance, my Jim, I apologize.  Yeah, sometimes he

12  stayed during the week, it just all depended.  His primary

13  residence was with his grandmother.

14  Q.   But sometimes he stayed at your house with you?

15  A.   Yes.

16  Q.   When your brother, Jim, was with you as well?

17  A.   Yes.

18  Q.   And may I ask where he would sleep when he stayed with

19  you?

20  A.   He would sleep in my bedroom.

21  Q.   Okay.  And you stated that at that time your brother,

22  Jim, would be sleeping downstairs on the couch, is that right?

23  A.   He had his choice of sleeping in my son's room or on the

24  couch downstairs, yes.

25  Q.   And you would sleep in your bedroom as well, I would

21

1  assume, correct?

2  A.   Yes.

3  Q.   So during that time you weren't keeping your eyes on your

4  brother, Jim, the entire time, were you?

5  A.   The whole night long?

6  Q.   Right.

7  A.   No.  When I got up to use the restroom usually, like I

8   said, I wouldn't go to sleep until after I knew he was

9   sleeping.

10  Q.   All right.  But then after you went to sleep, you didn't

11  go downstairs periodically throughout the night and check to

12  make sure that Jim was still there?

13  A.   I'd get up two or three times a night, yes.

14  Q.   So you did check on him periodically throughout the

15  night?

16  A.   Yes.

17  Q.   Each and every time your brother, Jim, was at your house?

18  A.   Yes.  I still get up and check on my kids to this date.

19  Q.   Did you and your fiance go out, I mean I would assume you

20  must have dated or gone out sometimes?

21  A.   We went out on one date the whole time we've been

22  together in nine years, our first date.

23  Q.   You've had one date with him?

24  A.   We went on one date.

25  Q.   You've been on one date with him?

22

1   A.   One date.

2  Q.  In nine years?

3  A.  In nine years.

4       THE COURT:  We don't have to go down there.

5       THE WITNESS:  That is true, that was our first date.

6  When you have kids, you don't have much of a choice.

7  BY MR. BURNS:

8  Q.  And you're married to this gentleman now?

9  A.  No.

10  Q.  Is it your testimony that you never left the house while

11  your brother was in the house?

12  A.  Well, if he was standing outside or something of the

13  apartment.  Well, if I had to go upstairs and use the restroom

14  or something.  He didn't go far, he was within my reach.

15  Q.  It is safe to say, ma'am, you weren't with your brother,

16  physically with your brother, at all times every moment of the

17  day and night during those visits, were you?

18  A.  No.

19  Q.  And do you have a specific recollection of someone from

20  Hermitage House calling you and checking on Jim's whereabouts

21  each and every weekend that he was staying with you?

22  A.  Actually, he was supposed to call in.  If he didn't call,

23  I think, I can't say, but I'm thinking like noon or 2 o'clock,

24  like the next day, then they would call, which never happened.

25  Because if he didn't want to call, then I basically dialed the

23

1  phone for him and handed it to him, he talked, then I talked.

2  It would just be like, well, we're going to go do this or we're

3  going to grandpa's house today or, basically, just to let them

4  know everybody was safe and okay.

5  Q.   How often did Jim, your brother, stay with you, was it

6  every other weekend -- how often, how many weekends in 1997, if

7  you know, or how many weekends in a month?

8  A.   Probably one to two.

9  Q.   In a month?

10  A.   Probably more of an average of one, let's just say one to

11  two.

12  Q.   You specifically recall that Hermitage House would call

13  your house each day that Jim was, your brother, Jim, was

14  staying at your house, you specifically recall that?

15  A.   No.  Jim would call during the week, usually like a

16  Wednesday or Thursday night if he had earned that.  And then he

17  would ask, well, would it be okay if I came home this weekend,

18  and I would tell him directly yes or no.  No being if I had to

19  work, then he couldn't come home.

20       THE COURT:  Mr. Burns, we're going to take a short

21  break.

22       MR. BURNS:  That's fine, judge.

23       THE COURT:  We'll take a five minute recess.

24       (Recess from 11:00 a.m.; until 11:08 a.m.)

25       THE COURT:  All right, we're back on the record, I'm


                              24


1  sorry for the interruption, Mr. Burns.

2       MR. BURNS:  That's quite all right, your Honor,

3  thank you.

4  BY MR. BURNS:

5  Q.   Ma'am, just to recap, you had just testified, I believe,

6  that you did not have a specific recollection of anyone from

7  Hermitage House calling you each and every day that your

8  brother was staying at your house during the year 1997, is that

9  correct?

10  A.   That's correct.

11   Q.    Now, Karen Jaworski is your sister?

12   A.    Yes.

13   Q.    And in 1997 where did Karen live?

14   A.    West 27th Street in Erie.

15   Q.    How far was that from where you lived?

16   A.    Approximately 35 miles.

17   Q.    And in 1997 when James was having home visits with you

18   and Karen, would you and Karen typically contact each other?

19   A.    Actually -- I talked to her occasionally, not a whole

20   lot.  Karen worked and, like I said, occasionally, not a whole

21   lot.

22   Q.    All right.  So you didn't talk to Karen too much during

23   that time -- and you're indicating no?

24   A.    Not overly excessive, we probably talk more now than we

25   did.


                             25


1        THE COURT:  The reason he said that is because the

2   court reporter can take a head shake down, so you have to say

3   yes or no out loud.

4        THE WITNESS:  Thank you.

5  BY MR. BURNS:

6  Q.   And, as you stated, you were responsible for supervising

7  your brother, correct?

8  A.   I was responsible as I could be.

9  Q.   You did not have your eyes on him at all times?

10  A.   That's humanly impossible, as best as I could.

11  Q.   Your brother, to the best of your knowledge, never left

12  your house without your permission?

13  A.   Correct.

14  Q.   Did he ever tell you that he was going to Karen's house

15  while he was staying with you?

16  A.   No.

17  Q.   Okay.  So if he did leave your house, it would have been

18  without your permission?

19  A.   Correct.

20  Q.   And you do not have a specific recollection of your

21  brother staying with you the weekend of August 9th and 10th of

22  1997, do you?

23  A.   No.

24  Q.   In fact, you really, as you sit here today under oath,

25  you really don't know where your brother was on the weekend of

1  August 9th and 10th of 1997, do you?

2  A.   No.

3       MR. BURNS:  Those are all questions I have, thank

4  you, ma'am.

5       THE COURT:  Thank you.  Redirect.

6                 REDIRECT EXAMINATION

7  BY MR. PATTON:

8  Q.   Judy, you had testified on cross-examination as to what

9  would hopefully be obvious, that Jim's your brother and you

10  love him, do you remember that?

11  A.   Yes.

12  Q.   Is the testimony you're giving here today somehow

13  untruthful so that you can try and help Jim get out of jail?

14  A.   No.

15  Q.   Is the testimony you're giving here today the truth as

16  best as you can recall?

17  A.   The truth as best as I can recall.

18  Q.   Every time that Jim had a home visit with you, did you

19  sign him out at Hermitage House?

20  A.   Yes.

21  Q.    And did you then sign him back in?

22  A.    Yes.

23  Q.    On every home visit, at least once during the time of a

24  home visit, did you speak with someone at Hermitage House?

25  A.    Yes.

27

1  Q.    Over the telephone?

2  A.    Yes.

3  Q.    And during that phone call, did you confirm that Jim was

4  with you at your residence?

5  A.    Yes.

6  Q.    And just so I can try to make sure that this is clear, it

7  was your understanding that it was Jim's responsibility to call

8  Hermitage House, correct?

9  A.    Yes.

10  Q.    And that you had been instructed that if Jim did not

11  call, that the people from Hermitage House would call?

12  A.    Yes.

13  Q.    But is it accurate, I believe your testimony was that the

14  Hermitage House people never had to initiate the call because

15  either Jim or yourself called every time?

16  A.    To the best of my knowledge, I don't believe they ever

17  had to call.  Like I said, I really can't remember if it was

18  like noon or 2 o'clock, by a certain timeframe if you didn't

19  call, that they would call.  But if I asked Jim to call and

20  he's like no, I'll wait a little bit, sometimes in fact I

21  dialed the phone, I handed it to him and he talked and I

22  talked, affirmed everything was okay and that was it.

23  Q.    Okay.  So is it accurate to say that when you say

24  Hermitage House never called, the reason they never called was

25  because you made sure Jim called every time he was at your

28

1  house?

2  A.    Yes.

3          MR. PATTON:  Those are my questions, your Honor.

4                    RECROSS-EXAMINATION

5  BY MR. BURNS:

6  Q.    You don't have any telephone records of any phone calls

7  made from your house to Hermitage House, do you?

8  A.    I don't save phone records.

9  Q.   Do you have a specific recollection of any phone calls

10  between your house and Hermitage House on the week of August

11  9th and 10th of 1997; you don't, do you?

12  A.   No, not on a certain date I wouldn't.

13       MR. BURNS:  Thank you.

14       THE WITNESS:  You're welcome.

15       THE COURT:  Thank you, you're excused.

16       MR. PATTON:  Your Honor, may Judy be allowed to stay

17  in the courtroom during the rest of the proceedings?

18       THE COURT:  I think that's fine.

19       MR. BURNS:  I don't object to that.

20       MR. PATTON:  Your Honor, we'd next call Karen

21  Jaworski.

22       THE COURT:  Ms. Jaworski, come on up to the witness

23  stand on my right and I'll have you sworn in.

24       THE CLERK:  Ma'am, would you raise your right hand,

25  please.


                          29


1       KAREN JAWORSKI, PETITIONER WITNESS, SWORN

2       THE CLERK:  Please be seated.  State your full name

3   and spell your last name for the record?

4         THE WITNESS:  Karen Jaworski, J-a-w-o-r-s-k-i.

5                        DIRECT EXAMINATION

6   BY MR. PATTON:

7   Q.   Karen, do you know Jim Tice?

8   A.   Yes.

9   Q.   How do you know Jim?

10  A.   He's my little brother.

11  Q.   Is this Jim sitting here at the counsel table?

12  A.   Yes.

13  Q.   Karen, I want to ask you some questions about events that

14  occurred in 1997, okay?

15  A.   Yes.

16  Q.   Now, as Jim's sister, did you become aware that at some

17  point in time Jim had been put in juvenile placement by the

18  Erie County Juvenile Probation Department?

19  A.   Yes.

20  Q.   At some point during the various places Jim was moved

21  around through the system, did you learn he had been placed at

22  a place called Hermitage House?

23  A.   Yes.

24  Q.   Do you recall Jim being at Hermitage House?

25  A.   Yes, I do.


30


1  Q.   When Jim was at this Hermitage House, was he allowed at

2  some point to come to your home for home visits?

3  A.   Yes, he was.

4  Q.   Would those generally occur on weekends?

5  A.   Yes.

6  Q.   Now, at the time that these home visits from Hermitage

7  House occurred, where were you living?

8  A.   I lived at 931 West 27th Street in Erie, Pennsylvania.

9  Q.   And who lived with you in that house?

10  A.   My children and myself.

11  Q.   And who are your children?

12  A.   Jennifer and Nathan Jaworski.  Also, Christopher and

13  Joshua, we would switch weekends, and they would come and stay

14  on some weekends.

15  Q.   So is it fair to say Jennifer and Nathan were staying

16  with you --

17  A.   Full-time.

18  Q.   Full-time.

19  A.   Yes.

20  Q.   And were Christopher and Joshua staying with you

21  full-time?

22  A.   Not at that time.

23  Q.   Who else would they be staying with?

24  A.   Their father.

25  Q.   The home visits from Hermitage House, how would Jim

31

1  physically get from Hermitage House to your house?

2  A.   I would go and pick him up.

3  Q.   When you would go to Hermitage House, were there

4  procedures you had to follow when taking Jim from Hermitage

5  House to your house for the home visits?

6  A.   Yes, very strict ones.

7  Q.   Would you explain those procedures to the judge, please?

8  A.   Yes.  I went to pick him up and when I was there, we had

9  a paper that we signed, sort of a contract, that would have all

10  the rules and regulations that I would need to follow during a

11  weekend.  And I would need to sign to that, that I would agree

12  to that while he was with me.

13  Q.   Could you explain generally what those rules were?

14  A.   That he would stay with me, that he was not allowed to go

15  anywhere else.  That he would not be able to just take off with

16  friends or anything, that I was the one supervising him, that I

17  would agree to do exactly that.

18  Q.   And you would have to sign that --

19  A.   Yes.

20  Q.   Before you were allowed to take Jim out of the facility?

21  A.   Yes.

22  Q.   Did you have to do that every time Jim had a home visit

23  to your home?

24  A.   Yes.

25  Q.   Did you take the requirement that you supervise Jim while


                                32


1  he was at your house for home visits seriously?

2  A.   Very much so.

3  Q.   Did you take steps to make sure that you did supervise

4  Jim while he was at your house for the home visit?

5  A.   Yes, I did.

6  Q.   What would you do to make sure that you knew where he

7  was?

8  A.   Usually wherever I was, he needed to be with me.  For

9  example, there was one home visit that I had to work on a

10  Saturday, and I owned my own business at the time, so I had to

11  bring him with me.  They needed to know the hours I was working

12  and the phone number there so they could call.  And they did.

13  Q.   When you're referring to they, who are they?

14  A.   Hermitage House employees and counselors or whoever was

15  in charge of him at the time.

16  Q.   During the course of the home visits that Jim would have

17  to your house, would Jim have to have contact with Hermitage

18  House over the telephone?

19  A.   Yes.

20  Q.   How would that work?

21  A.   He was to either phone in or they were to call.  Most

22  likely they called.  Usually, they would call at random, it

23  wasn't a set time.  So they always had to know where we were

24  going to be.

25  Q.   When those calls occurred, did you speak to the people

33

1  from Hermitage House during those telephone calls?

2  A.   Yes, I would speak with them first, and they would expect

3  Jim to be put on the phone and speak with him.

4  Q.   Did these telephone calls occur every time Jim had a home

5  visit with you?

6  A.   Yes.

7  Q.   And at least each time there was a phone call that you

8  were aware of, did you speak to the staff from Hermitage House

9  during that telephone call?

10  A.   Yes, I did.

11  Q.   And Jim as well?

12  A.   Yes.

13  Q.   After the home visit was finished and it was time for Jim

14  to go back to Hermitage House, how would you get him back

15  there?

16  A.   I would bring him back.

17  Q.   Were there procedures you had to follow when you would

18  take Jim back and actually arrive at Hermitage House?

19  A.   Yes.  A counselor had to check him in, he would sit and

20  speak with the counselor or I would fill out what they call a

21  summary page of how things went during the weekend, what

22   activities took place, how his behavior was, that sort of

23   thing, just to let them know that all went well.

24   Q.   Were you required to sign anything saying that you were

25   signing Jim back in at the end of his home visit?


34


1   A.   Yes, on the bottom of that I would have to sign that.

2   Q.   Did that occur every time Jim had a home visit to your

3   house?

4   A.   Yes.

5   Q.   And did it occur every time you took him back to

6   Hermitage House?

7   A.   Yes.

8   Q.   During the timeframe that Jim was at Hermitage House, was

9   there ever a time when Jim showed up at your residence when he

10   was not scheduled to have a home visit?

11   A.   No.

12   Q.   Was there ever anytime where you weren't expecting Jim

13   that he somehow showed up at your house and said hey, I'm here

14   to spend sometime with you?

15   A.   No, not at all.

16  Q.    Is it accurate to say that during the time Jim was at

17  Hermitage House, the only time he was at your house was during

18  approved home visit weekends?

19  A.    Correct.

20  Q.    Was there anytime during the timeframe that Jim was at

21  Hermitage House where your sister, Judy, called up and said

22  hey, Jim's at my house for a home visit but he wants to come

23  and see you so I'm sending him over to your house?

24  A.    No, not at all.  That would have been almost impossible,

25  we live an hour apart.  And at the time she wouldn't have been

35

1  able to bring him to me, and he couldn't have made it on his

2  own.

3  Q.    Was there ever a time during the timeframe that Jim was

4  at Hermitage House where Jim had an approved home visit to

5  Judy's house, but you really wanted Jim to come to your house,

6  so you would go and get Jim at Judy's and bring him back to

7  your house?

8  A.    No, not at all.  No, that wouldn't have been allowed, we

9  would have gotten in trouble for that.

10  Q.   Now, Karen, as you are sitting here today testifying,

11  do you have a specific memory of the exact dates of the home

12  visits Jim had to your house in 1997?

13  A.   No, I do not, I'm sorry.

14  Q.   Is it fair to say that you know, through your

15  recollection and memory, that Jim had home visits during the

16  summer of 1997, but you do not recall the exact dates of those

17  visits?

18  A.   That's correct.

19  Q.   Now, you testified at Jim's trial, is that correct?

20  A.   Yes.

21  Q.   Before you testified at that trial, did you have any

22  meetings with the prosecution to discuss your testimony?

23  A.   Yes, we had several.

24  Q.   When you say we --

25  A.   My daughter and I.

36

1  Q.   During any of these -- let me just ask you, during these

2  meetings, what would occur, generally speaking?

3  A.   Usually the person that we met with would go over the

4   information, gave us the information, as far as the dates went.

5   Talked to us about -- talked more to my daughter than to

6   myself, about what she was, maybe questions she might be asked.

7   Things she might need to talk about, to refresh her memories

8   since it had been a little while.

9   Q.   During any of these meetings, did the prosecutor or

10  someone from the District Attorney's Office speak to you about

11  the dates they believe Jim had home visits to your house?

12  A.   Yes, they did.

13  Q.   Could you explain that to us?

14  A.   Yes.  I'm a not a hundred percent sure if he showed me a

15  paper with dates on it, but he did cover and say these are the

16  dates that Jim had home visits.  And since I didn't remember

17  the exact dates, I went along with what he had to say because

18  he had that information.

19  Q.   Okay.  Now, is it accurate to say that at the time you

20  were meeting with the prosecutor -- at the time you were

21  meeting with the prosecutor, did you have a specific memory of

22  the exact dates of all of Jim's home visits to your house?

23  A.   No, I did not.

24  Q.   At the time you testified at the trial in October of

25  1999, did you have a specific memory as to the exact dates Jim

37

1  had been at your house?

2  A.   No, I did not.

3  Q.   Were you aware at the time of the trial that the original

4  charges against Jim had charged dates different than the dates

5  he was on trial for in October of 1999?

6  A.   No, I didn't.

7  Q.   Based on the interaction you had with the staff at

8  Hermitage House, what was your impression with regards to their

9  competency in the way they kept track of home visits?

10  A.   I felt they very professional.  I thought they handled

11  themselves well, as far as their meticulous nature in recording

12  their information and the way they executed it.

13  Q.   Karen, is it fair to say since Jim is your brother that

14  you love him?

15  A.   I do love him.  But --

16  Q.   Are you testifying here today untruthfully so that you

17  can help Jim get out of jail?

18  A.   Absolutely not.

19  Q.   Is the testimony that you've given here today and are

20  giving, accurate to the best of your memory?

21  A.   Yes.

22       MR. PATTON:  May I have a moment, your Honor.

23       THE COURT:  Yes.

24  BY MR. PATTON:

25  Q.   Karen, when Jim did come to your house for the approved


38


1  home visits, did you make sure you supervised him throughout

2  the course of the weekend?

3  A.   I did.

4  Q.   Did you ever have any problems with Jim not following the

5  rules or not listening to what you said or anything like that?

6  A.   There was just one time where he had went with who was

7  now my ex-boyfriend to work with him for a couple of hours,

8  without really talking to me about that, and they left in the

9  morning.  I was upset about that because I'm a rule follower

10  and it's very difficult for me to not be accountable.  I'd like

11  to make sure that I'm accountable, and that I'm able to know

12  where people are and things are and that sort of thing.  So I

13  like to keep track of that.  So I was upset about that.

14  Q.    So Jim had left, but he was with your fiance at the time,

15  your boyfriend?

16  A.    Boyfriend at the time.

17  Q.    Okay.  So Jim was supervised by your boyfriend but you

18  found that unacceptable?

19  A.    Yes, because even though he was with him, he still wasn't

20  with me.  And I needed to make sure that I could be accountable

21  to them in case anything was to happen.

22  Q.    Other than this incident when Jim left with your

23  boyfriend, was there any time when Jim was unaccounted for by

24  you during a home visit?

25  A.    No, not to my knowledge, no.


39


1  Q.    Is there any time you were trying to find Jim and he was

2  gone from the house and you didn't have any idea where he was?

3  A.    Not at all, no.

4  Q.    We talked some about Hermitage House and the procedures

5  they followed with doing the home visits.  And you also talked

6  some about, at least your impression of how the staff there

7   handled themselves.  If you had to -- let me ask you this.

8   Would you believe their records to be accurate based on your

9   interaction with them?

10  A.   Yes, absolutely.

11  Q.   If the Hermitage House records indicate that the home

12  visit Jim had on the weekend of August 9th and 10th of 1997 was

13  to Judy's house, would you believe those records to be

14  accurate?

15  A.   Yes.

16  Q.   Have you ever spoken with Jim's trial attorney, Anthony

17  Logue, outside of your testimony at the trial?

18  A.   No.

19  Q.   Did Mr. Logue ever contact you to try to interview you

20  prior to the trial?

21  A.   No, not at all.

22       MR. PATTON:  Those are my questions, your Honor,

23  thank you.

24       THE COURT:  Cross-examine.

25       MR. BURNS:  Thank you, your Honor.

40

1                        CROSS-EXAMINATION

2    BY MR. BURNS:

3    Q.    Ma'am, good morning.  My name is Michael Burns, I

4    represent the District Attorney's Office here in Erie County,

5    the Commonwealth of Pennsylvania, who are among the respondents

6    in this case.  I'm going to ask you a few questions now.  If

7    there's any question you don't understand or if you need

8    clarification on, please tell me, I will do that for you, okay?

9    A.    Thank you.

10   Q.    It's not my intention to upset you or give you a hard

11   time, I just need to ask you some questions.  Now, as you

12   indicated to Attorney Patton, Jim Tice is your brother and you

13   do love him, correct?

14   A.    Correct.

15   Q.    All right.  And he's been in prison now for approximately

16   the last six years?

17   A.    Yes.

18   Q.    That's got to be pretty upsetting to you, correct?

19   A.    Also, the victim is my daughter.  If he did the crime,

20   unfortunately, then he would have to pay for that crime.  So --

21   though I love him, if he did something wrong, again, he needs

22   to be held accountable for it.

23  Q.   All right.  You understand that in his jury trial in 1999

24  he was held accountable, do you understand that?

25  A.   Yes.


                                    41


1  Q.   Do you understand that he was found guilty?

2  A.   Yes.

3  Q.   That was based on evidence that was presented at trial,

4  do you understand that?

5  A.   Um-hum.

6  Q.   That included your testimony, you testified at that trial

7  in 1999, do you remember that?

8  A.   Yes.

9  Q.   We'll get to that in a minute.

10       MR. BURNS:  I would ask permission to approach the

11  witness, your Honor.

12       THE COURT:  Permission granted.

13  BY MR. BURNS:

14  Q.   Ma'am, I'm going to show you, I'm going to ask you to

15  take a look at -- these are three pages from the trial

16  transcripts from your brother's trial in 1997.  And

17   specifically I'm referring to pages 36 and 37 of that trial

18   transcript.  I'm going to ask you follow along with me as I

19   read some of the portions of that transcript.  Now, ma'am, in

20   your affidavit and in your direct testimony, you just testified

21   you have no specific recollection of the dates that your

22   brother stayed at your house, correct?

23   A.    Correct.

24   Q.    All right.  Ma'am, I'm referring you to line 19 on page

25   36 of the trial transcript.  Now, this was your trial

42

1   testimony, do you understand that?

2   A.    Yes.

3   Q.    Do you remember taking an oath to tell the truth at that

4   trial?

5   A.    Yes.

6   Q.    Was there anything at the trial that was confusing to

7   you, were there any questions you did not understand?

8   A.    I'm not sure, I don't remember.

9   Q.    To the best of your recollection, you understood the

10   questions that were presented to you?

11  A.  Yes.

12  Q.  If there had been a question that were confusing to you,

13  you would have said so?

14  A.  I believe so.

15  Q.  Let's take a look at line 19 on page 36, and if you would

16  follow along with me, please.  The question was posed to you by

17  the assistant district attorney, Mr. Vogel, as follows:

18  Question:  "Karen, did there come an occasion in 1997 when your

19  daughter, Jennifer, reported something happening to her?"

20  Answer:  "Yes."  Question:  "When did this take place?"

21  Answer:  "She was getting ready to go to school in the morning,

22  Friday, the 22nd, I think it was in August, she was really

23  upset and then wanted talk to me."  That was your answer at

24  that time, correct?

25  A.  Correct.


43


1  Q.  Page 37, line 1.  Question:  "Did she tell you who she

2  said had been doing this to her?"  Answer:  "Yes."  Question:

3  "who she say?"  Answer:  "She said that Jim had been doing that

4  to her."  Question:  Now, was Jim visiting on a regular basis

 5  that summer?"  Answer:  "Yes."  Question:  "How often would he

 6  visit?"  Answer:  "Every two weeks."  Question:  "And was his

 7  next visit about to occur?"  Answer:  "Yes."  Question:  "So

 8  his prior visit would have been two weeks before?"  Answer:

 9  "Yes."  He was due to come Saturday morning, I was going to

10  pick him up."  Question:  "So that would have been Saturday,

11  the 23rd, was his next visit?"  Answer:  "Yes."  Question:  "So

12  his prior visit would have been Saturday, the 9th, that

13  weekend?"  Answer:  "Yes."

14       Ma'am, those were you answers, your responses at the time

15  of your brother's jury trial in 1999, correct?

16  A.   Correct.

17       MR. PATTON:  Your Honor, it was a bench trial, not a

18  jury trial.

19       MR. BURNS:  A bench trial.

20  BY MR. BURNS:

21  Q.   And those were your answers under oath at the time of

22  that trial?

23  A.   They were.  What happened was the gentleman, the

24  prosecutor I was speaking with, had shown a piece of paper with

25  a bunch of dates on it and very clearly had several dates on

44

1  there.  He said these were the dates that he was visiting.  I

2  said okay.  I don't remember, so I knew he was there in several

3  months, several times.  O I wasn't sure exactly, so I went with

4  what he said, he had it in writing.  And my memory is not that

5  good unfortunately.

6  Q.   But you agreed with him that your brother visited with

7  you the weekend of August 9th of 1997, correct?

8  A.   I had said that he had visited, I didn't remember the

9  exact dates, but that's what he told me.  So I said okay.

10  Q.   So you just went along with what the prosecutor asked

11  you?

12  A.   I went along with what he said because he had it in

13  writing, and my memory is not that good.  It's not that good

14  today and it wasn't then.

15  Q.   What he had in writing, ma'am, was based on records he

16  had from Hermitage House, correct?

17  A.   It was a piece of paper with dates on it.  If I remember,

18  it might have been him just telling me, I don't remember, I'm

19  sorry.

20  Q.    You testified earlier that the Hermitage House records,

21  as far as you know, are accurate and correct, right?

22  A.    I would believe they're written record would be with my

23  information, my signature.  But this was a piece of paper with

24  two or three dates or so on it.  If I do remember correctly.

25  Q.    If the Hermitage House records stated that your brother

45

1  had a home visit with either you or Judy on a particular

2  weekend, you would believe those records to be accurate?

3  A.    I'd agree with that, yes.

4  Q.    And at the time of the trial, you stated you went along

5  with what the prosecutor was asking you because he just showed

6  you a piece of paper, correct?

7  A.    Correct.

8  Q.    But you did not state at the trial that that was not your

9  specific recollection, you did not state I'm just agreeing with

10  you because you're showing me a piece of paper; you didn't say

11  that at the trial, though, did you, ma'am?

12  A.    No, I did not, I'm sorry.

13  Q.    Now, as far as the Hermitage House records, to state the

14  obvious, you don't know how those records were prepared, do

15  you?

16  A.   Can you explain?

17  Q.   You don't know how the Hermitage House records are

18  prepared?

19  A.   They seem pretty clear to me.

20  Q.   You don't work for Hermitage House?

21  A.   No, I do not.

22  Q.   You're not in charge of their record keeping?

23  A.   Not their particular record keeping.  But I have dealt

24  with drug service.

25  Q.   You don't make any of their records for them?


                              46


1   A.   I do not.

2   Q.   I'm sorry?

3   A.   I do not.

4   Q.   Ma'am, I would like to talk a little bit about the

5   affidavit that was prepared on your behalf.  I have a copy of

6   that.

7        MR. BURNS:  Permission to approach, your Honor.

8        THE COURT:  Permission granted.

9  BY MR. BURNS:

10  Q.    I want to show that to you, in case you need that to

11  follow along.

12  A.    Thank you.

13  Q.    Now, ma'am, in the affidavit you state the following:

14  "While on a home visit to my residence, Jim would never spend

15  the night anywhere but my house."  You're saying that Jim spent

16  the night only at your house, to the best of your recollection?

17  A.    When he was due to be at my house, he was only at my

18  house.

19  Q.    And now your testimony today is to the best of your

20  recollection, correct?

21  A.    Correct.

22  Q.    No one's memory is perfect, though?

23  A.    Correct.

24  Q.    Did Jim ever spend the daytime anyplace other than your

25  house when he had a home visit with you?


47


1  A.    Just that couple of hours he spent with Bill DeSantis.

2  And he spent the daytime with me at my work one time.

3  Q.    Bill DeSantis was your boyfriend at the time?

4  A.    On and off again, yes.

5  Q.    He spent a couple hours with Mr. DeSantis, that was

6  obviously without your approval?

7  A.    It was very early morning, I think it was 6 to 8 a.m.

8  Q.    My question was that was without your approval -- without

9  your knowledge?

10  A.    I don't remember, I'm sorry.

11  Q.    That's okay.  You were not present while he was with Mr.

12  DeSantis, correct?

13  A.    I was not.

14  Q.    You state in your affidavit that he was never at your

15  residence without prior approval, is that correct?

16  A.    Correct.

17  Q.    Then it's possible that he could have been at your house

18  if you approved?

19  A.    The prior approval would have been from Hermitage House.

20  Q.    Did you and your sister, Judy, have much contact with

21  each other during the year 1997 when your brother was having

22  these visits?

23  A.    Could you repeat the question.

24  Q.   Judy Tice, who testified earlier, is your sister,

25  correct?


48


1  A.   Yes.

2  Q.   And where did Judy live in relation to you in 1997?

3  A.   She lived about an hour away in Corry, Pennsylvania.

4  Q.   During the year 1997, during this time period when Jim

5  had home visits with you, did you and Judy speak on a regular

6  basis, did you have regular contact with each other?

7  A.   Yes.

8  Q.   You did have regular contact, how often would you contact

9  with her?

10  A.   I'm not sure.

11  Q.   Was it once a week?

12  A.   I'm sure, yes.

13  Q.   About once a week?

14  A.   I'm not a hundred percent sure, but I would imagine.

15  Q.   Is that a fair approximation?

16  A.   I would venture a yes.

17  Q.   So your testimony is that if Jim was scheduled to go to

18  Judy's house, he would never come to your house, to the best of

19  your recollection?

20  A.    He wouldn't be able to, I wouldn't have come and got him.

21  She didn't have a way to bring him to me.

22  Q.    All right.  Some of his visits were to Judy, though,

23  correct?

24  A.    Correct.

25  Q.    All right.  So it would be fair to say that about half

49

1  the visits were to you and half were to Judy?

2  A.    That would be fair to say.

3  Q.    You never got calls from Hermitage House, you never

4  received calls from Hermitage House on weekends when Jim was

5  supposed to be with Judy, did you?

6  A.    No.

7  Q.    Now, during Jim's visits with you, would Jim stay at your

8  house the entire weekend?

9  A.    Jim was with me wherever I was, pretty much.

10  Q.    Were you at the house the entire weekend?

11  A.    If I wasn't at work.  Or if we went out doing something.

12  Q.  So sometimes you or Jim would be out of the house?

13  A.  Jim and I and the children went to see a movie or out to

14  dinner.

15  Q.  Where do you work?

16  A.  I owned my own business.

17  Q.  How many hours did you work during the weekend, what

18  hours did you work?

19  A.  Ten to five.

20  Q.  Ten to five, Saturday?

21  A.  Yes.

22  Q.  Sunday?

23  A.  No.

24  Q.  So you worked on from ten to five on Saturday?

25  A.  Yes.


50


1  Q.  All right.  And Jim wasn't with you then, was he?

2  A.  Yes, he was, he had to be.  They had to have my phone

3  number there and they called me there.

4  Q.  And you recall them doing that on each and every

5  occasion?

6   A.   That only happened one time.

7   Q.   Now, Jim, obviously -- you were not keeping your eyes on

8   Jim the entire time during each of these visits, correct?

9   A.   I did the best I could.

10   Q.   So the answer is, yes or no, you were not keeping your

11   eyes on him the entire time during each of these visits?

12   A.   I imagine that I would as if he was my own child I would

13   watch him.

14   Q.   Now, if Jim were scheduled to be with Judy on a

15   particular weekend, you wouldn't know if Hermitage House --

16   whether or not they would call Judy's house during that

17   weekend, would you?

18   A.   That was their policy to call, so I'm assuming they

19   would.  But I wasn't there when they called, so no.

20   Q.   Okay.  And you don't have any phone records of any calls

21   between your residence and Hermitage House, do you?

22   A.   No.

23   Q.   Now, when Jim was at your house, did he ever babysit your

24   children?

25   A.   No.

1   Q.   Never?

2   A.   Never that I can remember.

3   Q.   Now, Bill DeSantis you mentioned, did he live with you at

4   the time?

5   A.   No, he never lived with me.

6   Q.   And he was your boyfriend?

7   A.   On and off again boyfriend.

8   Q.   How many visits would Jim have with you during a typical

9   month, if you know?

10  A.   Probably one.

11  Q.   Okay.  Now, Mr. DeSantis, your boyfriend in 1997, would

12  he ever spend the night with you?

13  A.   On occasion.

14  Q.   Did you and he go out on dates?

15  A.   No, never.

16  Q.   Never?

17  A.   We didn't go on dates.

18  Q.   Never went out at night?

19  A.   I don't remember, but not to my knowledge.

20  Q.   You never left the house with Mr. DeSantis, just you and

21  he?

22  A.   No.

23  Q.   Never, to the best of your recollection?

24  A.   Not to the best of my recollection, we were broke up more

25  than we were together in '97.


52


1  Q.   Okay.  Did you and Mr. DeSantis ever go to Florida?

2  A.   I went to Florida but not with him.

3  Q.   Okay.  Do you believe your brother is a truthful person?

4  A.   I'm not sure how to answer that.

5      MR. PATTON:  Your Honor, objection, I don't know

6  what the relevance of that is to today's hearing.

7      MR. BURNS:  I'll get to the next question.

8  BY MR. BURNS:

9  Q.   If your brother testified at anytime that he had babysat

10  your children during this period, would he be wrong about that?

11  A.   He could be.

12  Q.   If he had testified that you and your boyfriend went to

13  Florida together, he'd be wrong about that?

14  A.   I went to Florida -- he went to Florida, two weeks later

15  I went.  So we didn't go together, I do know that much.

16  Q.   Okay.

17  A.   I do remember that much.

18  Q.   Now, ma'am, as I believe you already indicated, not to

19  belabor the point, but you don't know where your brother was

20  scheduled to be, where his home visit was scheduled to be on

21  the weekend of August 9th and 10th, 1997, do you?

22  A.   I don't remember.

23  Q.   And you're stating now under oath as you sit here today,

24  you don't know whether or not your brother was at your house or

25  Judy's house on that weekend, do you?


                                53


1  A.   I just don't remember.  If I may say something?

2        THE COURT:  Mr. Burns, the witness just asked you a

3  question.

4        THE WITNESS:  That's okay.  Never mind, I'm sorry,

5  thank you.

6        THE COURT:  That's all right.

7  BY MR. BURNS:

8  Q.   You don't know where your brother was the weekend of

9  August 9th of 1997, do you, ma'am?

10  A.    I don't have a very good memory.  I actually take

11  ginkgo biloba right now to help with my memory.  So I don't

12  have the exact date in mind, I went with what the prosecutor

13  said.

14  Q.    So today you do not have a specific recollection?

15  A.    If I think about it, I can remember that he did -- I

16  believe it was every other two weeks he spent at my house,

17  every other two weeks he spent at her house.

18  Q.    But, again, you don't have a specific recollection about

19  August 9th and 10th, do you?

20  A.    Not specific.

21        MR. BURNS:  Thank you, ma'am, that's all I have.

22        THE COURT:  Redirect.

23            REDIRECT EXAMINATION

24  BY MR. PATTON:

25  Q.    Karen, at the time of Jim's trial, were you aware that


54


1  the charges against Jim were broken into two separate groups, a

2  charge that covered the timeframe from the day after Jim's 18

3  birthday through August 8th; and another set of charges that

4  dealt exclusively with the weekend of August 9th and 10th?

5  A.   I had no idea, no, I didn't.

6  Q.   Was the testimony that you gave with regard to the dates

7  Jim was at your house at the trial based on information you

8  received from the prosecution?

9  A.   Yes.

10  Q.   If at the trial you had been shown records from Hermitage

11  House, that Hermitage House had sent to the Juvenile Probation

12  office saying that on the weekend of August 9th and 10th Jim

13  was on a home visit to Judy's house, would you have accepted

14  that as being accurate?

15  A.   Yes.

16  Q.   And Mr. Burns talked to you about you not participating

17  in the record keeping at Hermitage House; but you participated

18  in signing the home visit contracts for Jim?

19  A.   Yes.

20  Q.   For when he came to your home?

21  A.   Yes.

22  Q.   Is it also accurate to say that you signed the Hermitage

23  House paperwork signing Jim out and signing him back in every

24  weekend he had a home visit to your house?

25  A.  Yes.


55


1  Q.  And you did that every time?

2  A.  Yes, it was mandatory.

3  Q.  And if an individual from Hermitage House who wrote the

4  progress report that said Jim was at Judy's house for a home

5  visit on August 9th and 10th said that when he wrote that

6  report he used the home visit contracts, telephone logs for

7  calls that were made during the weekend, and the other

8  paperwork kept by Hermitage House, in writing that progress

9  report, would you have accepted that progress report as being

10  an accurate statement as to where Jim was?

11  A.  Absolutely, yes.

12  Q.  Indeed, if someone had, at the time of the trial, gotten

13  the records from Hermitage House and shown you the log for

14  signing in and signing out for home visits, you could have been

15  shown both yours and Judy's record of signing Jim in and out

16  for home visits?

17      MR. BURNS:  That's now speculative.

18      THE COURT:  Your objection?

19        MR. BURNS:  Leading and calling for speculation,

20   objection.

21        THE COURT:  Well, it is speculative, I'll sustain

22   the objection.

23   BY MR. PATTON:

24   Q.   You run your own business, is that correct?

25   A.   I did at the time.


56


1    Q.   During the course of running that business, were you

2    required to keep records?

3    A.   Absolutely.

4    Q.   And did there ever come a time when you would have to

5    rely on information that was contained in the records to try

6    and determine if a particular event had occurred?

7    A.   Yes.

8    Q.   Even if you didn't have a specific memory as to whether

9    or not the events occurred?

10   A.   Correct.

11        MR. PATTON:  Those are my questions, your Honor.

12        THE COURT:  Any recross, Mr. Burns?

13        MR. BURNS:  No recross, your Honor, thank you.

14        THE COURT:  Then you're excused, thank you very

15  much.  You may step down.  Do you wish to have these marked,

16  these are testimony pages, is that not correct?

17        MR. BURNS:  Yes, your Honor.

18        MR. PATTON:  They're already contained in the

19  record.

20        THE COURT:  They are part of the record.  Because we

21  have the whole trial testimony.

22        MR. PATTON:  The transcript pages are excerpts from

23  what's marked as Petitioner's Exhibit G in the record.  And the

24  affidavit of Karen Jaworski is marked as Petitioner's Exhibit

25  ZZ in the record.


57


1         THE COURT:  The non-jury trial transcript is part of

2  the record as part of the original, they're part of the

3  underlying habeas case.  All right, Mr. Patton.

4         MR. PATTON:  Your Honor, the first issue I would

5  like to address is the issue you flagged at the status

6  conference we had when this hearing was scheduled.  Asking Mr.

7   Burns and I to be prepared to address the issue of whether or

8   not when you are conducting a miscarriage of justice analysis,

9   in trying to decide whether or not the new evidence we have

10  presented is sufficient to satisfy the Schlup standard.  If you

11  have --

12          THE COURT:  Which is often called -- you know how I

13  do this, I'll be interrupting you constantly, I apologize in

14  advance.  Which is often called the actual innocence standard?

15          MR. PATTON:  Correct.

16          THE COURT:  Which you probably think is a misnomer?

17          MR. PATTON:  It is a misnomer in the sense that --

18          THE COURT:  The test isn't exactly that?

19          MR. PATTON:  Correct.  The test is not whether or

20  not a petitioner, in this case Jim, has proven factual

21  innocence.  The question is have we presented new evidence that

22  when considered in light of all the record, leads you to find

23  that no reasonable juror would vote to find Jim guilty beyond a

24  reasonable doubt of both sets of charges.

25          THE COURT:  And my concern was does that reasonable

58

1  juror have to listen to all of the other testimony as it was

2  given on October 6, 1999; or does that reasonable juror have

3  the testimony as it would have changed in light of the evidence

4  that you brought forward now?

5      MR. PATTON:  Your Honor, the opinion in Schlup

6  itself deals with that issue.  The pinpoint cite for the

7  Supreme Court version, is page 868, it's page 330 of the United

8  States Report.  This is the section of the opinion in which the

9  court is differentiating the miscarriage of justice standard

10  from the Jackson v. Virginia sufficiency of the evidence

11  standard.  In distinguishing those two standards and making

12  clear that they are different, the court stated "the Jackson

13  standard thus differs in at least two important ways from the

14  carrier standard.  First, under Jackson, the assessment of the

15  credibility of witnesses is generally beyond the scope of

16  review.  In contrast, under the gateway standard we described

17  today, the newly presented evidence may indeed call into

18  question the credibility of the witnesses presented at trial.

19  In such a case, the habeas court may have to make some

20  credibility assessments."

21      THE COURT:  So we take the evidence as it was

22  presented, but we don't have to -- we can make credibility

23  determinations on a review, collateral review?

24       MR. PATTON:  Correct.  And also the 9th Circuit en

25  banc has found, this is in Sistrunk v. Armenakis --


59


1        THE COURT:  9th Circuit?

2        MR. PATTON:  Yes, ma'am.  It's 292 F.3d page 669, at

3  page 673.

4        THE COURT:  Discussing Schlup?

5        MR. PATTON:  Yes.  In discussing what showing can

6  meet that requirement.  They say we held in Carriger v.

7  Stewart, 132 F.3d 463, at pages 478 through 479, which is 9th

8  Circuit, 1997, also en banc, "that where post-conviction

9  evidence casts doubt on the convictions by undercutting the

10  reliability of the proof of guilt, but not by affirmatively

11  proving innocence, that can be enough to pass through the

12  Schlup gateway to allow consideration of otherwise barred

13  claims."  Carriger dealt with procedurally defaulted claims

14  where the new evidence presented was a recantation from the

15  prosecution's main witness, admitting that he in fact committed

16   the crime.  There was still evidence to suggest that the

17   defendant, the petitioner in the habeas case, may have been

18   present and had some kind of participation.  But in Carriger,

19   en banc the 9th Circuit found even though the new evidence

20   didn't establish that the petitioner was, it was impossible for

21   the petitioner to commit the offense, they found that the new

22   evidence so undercut the reliability of the state's case

23   presented at trial, that had a reasonable juror heard all of

24   the evidence, not just the trial testimony, but also the newly

25   presented evidence, and then evaluated the strength of the

60

1   government's case, that no reasonable juror would have voted to

2   convict, would have found guilt beyond a reasonable doubt.

3        THE COURT:  Here's why it is different in my mind

4   and I'm really struggling with it.  So I'm going to play the

5   devil's advocate so we can struggle through it together.  In

6   this case the credibility I would be determining would be, I

7   believe, Ms. Jaworski.  Because she testified now that she

8   testified at trial based upon information that was given to her

9   by the prosecutor.  So I would judge her credibility today.

10   And let's say I determined that she was credible today and so

11   that explained and undermined her testimony at trial.  I then

12   still have testimony of the petitioner, and I have testimony of

13   the other sister, Ms. Tice, that explained to us that -- didn't

14   testify exactly where he was at any given point, but all agreed

15   such that there was no testimony opposite of that, that he was

16   at Ms. Jaworski's house on the 9th and 10th of August.  There

17   was never any testimony that said -- there was never any alibi,

18   argument or any testimony other than that.

19          MR. PATTON:  At trial or included in the new

20   evidence?

21          THE COURT:  At trial.  So, therefore, I have to be a

22   reasonable juror listening to testimony that places him at Ms.

23   Jaworski's house on that weekend.  Except for the fact that Ms.

24   Jaworski now believes that she's not sure.  And that, in fact,

25   if the records of Hermitage House say he wasn't there, then


                                    61


1    perhaps he wasn't.  You see what I'm saying, it's not just her?

2           MR. PATTON:  I understand that.

3           THE COURT:  That's just not the only credibility --

4          MR. PATTON:  If we can, I believe you are focusing

5   right now on the weekend of August 9th and 10th --

6          THE COURT:  You haven't shown me anything about

7   other weekends today.

8          MR. PATTON:  Let's just focus on that weekend, which

9   was the charge continued in 3206 of 1998.

10          THE COURT:  I agree.

11          MR. PATTON:  The trial testimony was that the victim

12   did not recall any specific dates.  So she did not give any

13   specific dates, she simply was unable to do that.  Karen

14   testified to a belief that Jim had been coming to her house

15   every other weekend, that he was set to come to her house on

16   the weekend of -- Saturday, August 23rd, and then by inference

17   saying well, if he was coming every two weeks and if he was

18   coming on Saturday, August 23rd, his last visit should have

19   been the weekend of August 9th and 10th.  That was her

20   testimony.  Her testimony never at trial was I specifically

21   remember Jim being at my house on the weekend of August 9th and

22   10th.

23          THE COURT:  That's correct, but she did agree with

24   the prosecutor says he would have been there that weekend, she

25   said correct.  Of course today she was saying it was every

62

1   other two-week period, which would have messed that up.

2        MR. PATTON:  And so you now have the records from

3   Hermitage House, and Judy's sir testimony and Karen's testimony

4   and Jim's testimony.  Now, I will admit that neither Jim, in

5   his testimony at the last hearing, nor Karen, nor Judy, can

6   testify, nor have they testified that they are absolutely --

7   they have a specific memory that Jim was at Judy's house on

8   August 9th and 10th.

9        THE COURT:  I understand.

10       MR. PATTON:  But what you have is you have Mr.

11  Wellman's testimony regarding the procedures Hermitage House

12  used in doing home visits.  You have Mr. Wellman's testimony

13  that he used the signed home visit contracts.  He used the

14  telephone logs logging calls during the weekend that were made

15  to make sure Jim was where he was supposed to be.  He used all

16  those records in writing his progress report which undoubtedly

17  say that on the weekend of August 9th and 10th, Jim was at

18  Judy's house, not at Karen's house.  Now, Mr. Wellman said

19  look, I can't testify for sure that the telephone calls were

20   made to confirm Jim was there because I didn't work every

21   weekend.  And he had to admit the possibility that yes, it is

22   possible that when Jim was supposed to be at Judy's house, he

23   really went to Karen's house.  But his testimony --

24          THE COURT:  It's my recollection that he testified

25   that they didn't call every visit.  But these women testified

63

1   that in fact they did.

2          MR. PATTON:  I respectfully suggest that your memory

3   is inaccurate.  His testimony was the rules called for there to

4   be calls made every weekend.  That it was the juvenile's duty

5   to make the call.  If the juvenile did not make the call,

6   Hermitage House should have made a call to confirm.  He said I

7   can't testify -- he said when I was working, that's what I did.

8   And when I made the call, I spoke not only to the juvenile, but

9   I also spoke to the person that they were supposed to be on the

10   home visit with.  He then said I was not the person working

11   every weekend, so I cannot testify that every person working

12   for Hermitage House followed that procedure.  In my memory of

13   it, my belief is, I think he was expressing the belief that the

14    calls were made, but he couldn't say for sure that the person

15    from Hermitage House talked not only to Jim, but also would

16    speak to the particular sister where he was supposed to be.  He

17    said if they were following their training, they would have

18    done it.  But I can't say for sure they did it because I'm not

19    the one who did the call.  He then further testified that he

20    could testify -- he could state that Jim was following the home

21    visit contracts and was making the calls because Jim's visits

22    continued and increased and if Jim was not making the calls and

23    was not following the home visit contracts, his visitations

24    would not have continued.

25          THE COURT:  Okay.


64


1          MR. PATTON:  And with Judy and Karen's testimony

2    today, it does two things.  It confirms that the procedures

3    that Mr. Wellman said should have been followed by the

4    Hermitage House staff were in fact followed, that the calls

5    were made.  And that the staff from Hermitage House spoke both

6    to Jim, but also to either Karen, if the home visit was to

7    Karen's house, or Judy if it was at Judy's house.  So Judy and

8   Karen's testimony fits in with Mr. Wellman's testimony and

9   fills in whatever gap there was due to the fact that Mr.

10  Wellman had to admit that he wasn't the one that made all the

11  calls and, therefore, he couldn't testify that the calls were

12  made and that either Judy or Karen were spoken to.  So that's

13  filled that in.  And not only does that fill that in, you have

14  Judy and Karen saying look, every time we took Jim out, I had

15  to sign my name that I was signing him out.  I had to sign my

16  name signing Jim back in.  And, again, these are the records

17  that Mr. Wellman said he used in creating the progress reports.

18          THE COURT:  Barring prosecutorial misconduct, where

19  did they get the August 9th and 10th, did Ms. Jaworski say way

20  back then he was just here two weeks ago, where would they have

21  gotten that?

22          MR. PATTON:  I can tell you how I think they got it

23  and how I think the record backs up my belief.

24          THE COURT:  All right.

25          MR. PATTON:  Petitioner's Exhibit WW is the fax that


65


1   was sent from Hermitage House to Bob Blakely of Juvenile

2   Probation.  If you recall, Mr. Blakely testified that the

3   prosecution, either someone from the DA's office or someone

4   from either the detectives investigating the case, got ahold of

5   Mr. Blakely and said get us the dates of the home visits that

6   occurred after Jim's 18th birthday.  Mr. Blakely called

7   Hermitage House, requested the information, and then in

8   response Hermitage House sent Mr. Blakely the fax that is

9   contained in Exhibit WW.  Which lists the home visits, but does

10  not acknowledge the fact that there were home visits both to

11  Judy's house and to Karen's house.  And so then Mr. Blakely

12  also testified that he faxed that, Petitioner's Exhibit WW, to

13  the different investigators.  Exhibit XX is the fax cover sheet

14  of Mr. Blakely faxing that information to Bob Pietsch, who

15  was -- one of them is a juvenile detective and there was also

16  an adult detective.  Exhibit YY is the fax of Mr. Blakely

17  faxing Petitioner's Exhibit WW to Detective Zimmerman.  I don't

18  know if Zimmerman was the adult detective or the juvenile

19  detective, or Pietsch was the juvenile detective or the adult

20  detective.  But Blakely passed this information about the home

21  visits on to the detectives.  And I would submit the reasonable

22  inference is that's the information that got forwarded to the

23   prosecutor.  And the prosecutor just didn't realize that there

24   were home visits to both sisters.  At the trial you have Ms.

25   Jaworski testify today that she did not understand that Jim was


                                    66


1   charged in separate charging documents that broke the charges

2   up into various dates.

3          THE COURT:  It actually broke it up into one big

4   chunk and then that weekend.  And that weekend was important

5   because of the medical tests, was that not correct, what was

6   that about?

7          MR. PATTON:  They wanted to get two convictions so

8   that they could give two separate punishments and make them run

9   consecutively.  It's the last one, they can try and identify

10   the last one, so that's how they're broke up.  What's still

11   somewhat unclear to me and if it rolls into our ineffective

12   assistance of counsel claim -- the charges were filed in

13   October of '98, at that time the one set of charges, 3207,

14   charged from the day after Jim's 18th birthday through August

15   15th.  And then 3206 charged August 16th.  Now, it also charges

16   as being August 16, 1998, that was obviously wrong.  It wasn't

17   until May of 1999 when the case was first called for trial,

18   that the dates get amended and changed from the day after Jim's

19   18th birthday to August 8th.  And then in case 3206, the date

20   gets changed from August 16th to August 9th and 10th.  And

21   there isn't -- there's no explanation in the trial transcripts

22   as to why that date's different.  The only thing I can

23   understand as to what would prompt them to change from August

24   16th to August 9th and 10th is the prosecution got Petitioner's

25   Exhibit WW, the fax with the home visits listed and saw it,


67


1   geez, it can't be the 16th because he didn't have a home visit

2   on the 16th, it had to have been the 9th and 10th.  And if you

3   look at the dates on Petitioner's Exhibit WW, they're not

4   exactly every two weeks, but they are roughly every two weeks.

5   And from Karen's perspective, without realizing that the

6   charges are broken up into two groups, the exact date of the

7   home visit isn't critical.  Because her testimony is yeah, he

8   was there throughout the summer.  And Jennifer testified that

9   he did this every time he came home.  So yeah, this happened.

10   But the particular date of August 9th and 10th, wouldn't

11   have --

12        THE COURT:  So the idea that she said that would not

13   have made sense.  Let me ask you another question.  Do you

14   believe that the court does this -- under Schlup.  Once the

15   evidence -- that we take the evidence now that we didn't have

16   then, that Hermitage House has records that he was at a

17   different sister's home on the weekend of the 9th and 10th.  We

18   find that credible.  Then we decide that the entire defense for

19   your client would have been different because he would not have

20   said yeah, he was there, tacitly.  None of the defense, the

21   defense would have been, at least to that information, at least

22   to that charge.  An alibi defense I wasn't there.  And so I

23   have to make that leap or I have to take everything that was

24   done in that trial and make the surmises you've made, plus the

25   testimony we have now -- and the new information, I mean it's


                              68


1   not a recant, is not a recanting?

2        MR. PATTON:  No, it's not.  Yes, I think you can say

3   that had this evidence been presented at trial, the defense

4   would been, at least at the 3206 charge, I was not there on

5    that date.  Now, it would not make the whole defense I was

6    never at Karen's house.

7            THE COURT:  It would make a defense for that charge?

8            MR. PATTON:  For that charge.  And so when Jim

9    admitted, he never admitted to being at Karen's house on any

10   particular date, his testimony was I was going there once a

11   month.  So yes, I was there.

12           THE COURT:  He never said I wasn't there that day?

13           MR. PATTON:  Correct.  But if you read the

14   transcript, he was never asked, ever, were you at Karen

15   Jaworski's house on the weekend of August 9th and 10th, never

16   asked that.  Never testified that he was there.  And, again,

17   your Honor, this trial is taking place over two years after the

18   alleged incident.  And I think with 3206, you can look at the

19   trial testimony, which the only trial testimony that linked,

20   that proved up the August 8th and 9th, the only testimony to

21   that was, well, was Karen's testimony that while I believe he

22   was coming every two weeks, that he was going to come on the

23   23rd, which means the last time he would have been here would

24   have been the 9th and the 10th.

25           THE COURT:  Obviously, the jury heard nothing other

1  than that?

2        MR. PATTON:  Correct.  It's important I think to

3  also remember the victim said look, I don't know if it happened

4  on that date or not.  And you take that and then you say, okay,

5  if the jury would have heard the testimony, if Mr. Logue had

6  gotten these records, these records would have been admissible

7  at trial and you can consider them in doing the Schlup

8  analysis, even if they're not admissible at trial, Schlup makes

9  that very clear.  But these would have been admissible at trial

10  as business records.  And so not only you would have had, the

11  defense could have brought in Mr. Wellman, he would have

12  brought in progress reports.  He also still would have had the

13  sign-in sheets and sign-out sheets.  They're gone now because

14  of the passage of time, Hermitage House had purged their files,

15  we had to get the progress reports from the Juvenile Probation

16  file.  I would submit that there's no way a reasonable juror on

17  3206, that no reasonable juror could have found Jim guilty

18  beyond a reasonable doubt for the weekend of August 9th and

19  10th.  Had they been presented the evidence from Hermitage

20  House, the records from Hermitage House and the testimony that

21  you heard from Judy today and the testimony that you heard from

22  Karen today.

23        THE COURT:  All right.  I understand your argument.

24  Should I look at any of the medical records on that as well?

25        MR. PATTON:  Well, the medical records -- I would

70

1  submit that the medical records, he was seen on September 12th.

2  Excuse me, Jennifer was seen on September 12th of 1997.  Dr.

3  Schober said that there were three injuries.  One injury she

4  dated as being six months or older, which of course puts it

5  outside the timeframe of even 3207.  The one injury she said

6  was still somewhat red, inflamed, which meant it was within a

7  couple of weeks.  And if you had the Hermitage House documents

8  show that the last time Jim was there was the last weekend of

9  July of 1997, which was the 25th to the 27th.  And the third

10  injury Dr. Schober said she couldn't date.  So the medical

11  evidence, there's nothing in the medical evidence that would

12  have bolstered the specific August 8th and 9th date.  There was

13  nothing in the medical evidence that indicated that the events

14  had to have occurred on --

15          THE COURT:  The two weeks could have been five

16   weeks?

17          MR. PATTON:  Correct.  A jury could have heard all

18   of this evidence, they could have heard all this evidence and

19   said look, we believe Jennifer's testimony that this was

20   happening.  But based on the evidence we have received, we have

21   heard from how the home visits worked and from Hermitage House,

22   and from Karen and Judy, that it didn't happen on the 9th and

23   10th.  Or certainly the Commonwealth hasn't proved beyond a

24   reasonable doubt that it happened on the 9th and 10th.  So even

25   if the jury was still willing to find Jim guilty of the charges


71


1   in 3207, which covered the day after his 18th birthday, through

2   August 8th, even if they would have accepted that testimony,

3   they still would have been presented with all of the evidence

4   that we are now presented with.  I would suspect that a

5   reasonable juror applying a reasonable doubt standard

6   conscientiously would said look, even if they proved these

7   things happened, they haven't proved beyond a reasonable doubt

8   that they happened on the 9th and 10th.

9      THE COURT:  So then a jury could, because there are

10  two counts, have found him not guilty on that count -- how does

11  a habeas court do that on one habeas petition?

12      MR. PATTON:  Because the habeas petition challenges

13  both convictions, your Honor.  And anytime someone is tried on

14  multiple counts in a particular trial, some evidence goes to

15  some counts, some evidence goes to other counts.  A jury can

16  choose to believe and find that a defendant is guilty of a

17  particular one of the counts or two or three four, but not

18  guilty of some of the other ones.

19      THE COURT:  When it happens in a habeas petition,

20  the entire conviction is thrown out?

21      MR. PATTON:  I don't believe that's accurate, your

22  Honor.  In this case, as Jim's case now stands in state court,

23  he has two separate convictions.  The conviction for the

24  charges of 3207 of 1998, and the conviction of the charges

25  contained in case number 3206.  It was the same judge, and he


72


1  received two separate sentences.  Now, the judge did order

2  those sentences to run consecutively.  But you can vacate the

3    conviction in case 3206 and leave the conviction in 3207.

4    Otherwise, your Honor --

5        THE COURT:  Do you have any support for that in the

6    law.  This is great for your client because it's my idea, I'm

7    thinking of all of the habeas that I've granted or recommended

8    be granted in my career and they've had separate charges but

9    the entire thing is gone.

10       MR. PATTON:  I have an example for you right here.

11   Jacobs v. Horn, 395 F.3d, page 92, (3rd Cir. 2005).

12       THE COURT:  Tell me about that?

13       MR. PATTON:  Mr. Jacobs was convicted of first

14   degree homicide for killing both his girlfriend and their

15   daughter.  He filed his PCRA petitions, exhausted, went into

16   federal court.  The district judge ordered -- vacated the death

17   sentence he had received.  But affirmed the convictions, both

18   murder convictions for both the girlfriend and the child.  The

19   Third Circuit reversed and vacated one of the convictions, the

20   conviction for the murder of the girlfriend, but denied relief

21   on the conviction for the baby.  And that was a joint trial

22   where he's charged in the same case.  And so they leave in tact

23   the convictions dealing with the infant, but vacated --

24          THE COURT:  Did they change the habeas ruling on the

25   sentence?


73


1          MR. PATTON:  No, they agreed with the district judge

2   that there had to be a new sentencing.  I'm trying to find the

3   exact language that they used in reaching their -- after they

4   find that the conviction for -- their vacating the conviction

5   for the girlfriend, they say the question remains whether

6   counsel's ineffectiveness also invalidates Jacobs' conviction

7   for murdering Holly, who was the child.  They then go on and

8   they find that there is not a basis for vacating.

9          THE COURT:  Do they send it back for resentencing?

10          MR. PATTON:  It says for these reasons we will

11   reverse the district court's decision denying federal habeas

12   relief as to Jacobs' claim of ineffective assistance of counsel

13   at the guilt phase in failing to investigate and present

14   evidence of mental disorders, but only as to Jacobs' conviction

15   for the first degree murder of Tammy Mock.  Again, Tammy Mock

16   is the girlfriend.  We will remand to the district court with

17   instructions to grant the writ, conditioned upon the

18    Commonwealth providing Jacobs a new trial on the charge of

19    murdering Tammy Mock.

20          THE COURT:  A new trial.

21          MR. PATTON:  I believe the death sentence was based

22    on -- I can't recall if the death sentence was based on the

23    murder --

24          THE COURT:  It's trickier when there are two trials

25    and you have a death sentence, but I understand what you're

74

1    saying.

2          MR. PATTON:  Undoubtedly, the Third Circuit said we

3    can look at this and we can vacate --

4          THE COURT:  You know the Third Circuit has also

5    upheld a total grant of a writ of habeas corpus on the finding

6    of one of the counts being --

7          MR. PATTON:  The reason they didn't in the Jacobs

8    case is the claim of ineffectiveness was failing to get medical

9    information that could have supported a diminished capacity

10    theory with regard to the murder of the girlfriend.  And the

11    Third Circuit said look, this information would have helped,

12    could have helped lower the first degree charge for murdering

13    the girlfriend from first to third, but it would not have been

14    sufficient to reduce the first degree murder of the child to

15    third, so there is basis for granting a new trial on that.  So

16    I would submit undoubtedly in this case you can vacate the 3206

17    conviction and leave the 3207.  Now, it is still our position

18    that the 3207 should be vacated.  But I think beyond any doubt

19    you can invalidate the 3206 and leave the 3207.  Because the

20    3207 can stand on its own.

21         THE COURT:  Now, I've interrupted you from the

22    minute you stood up.  And you were planning to make several

23    distinct arguments.  The first one I know was whether or not,

24    what the test was, what my review would be, what the court's

25    review was.  Because that question was flagged to you and to


75


1    Mr. Burns in our hearing, our last conference.  The second

2    thing you were going to do is explain to me how I was going to

3    look at it I suspect and you've done that, is that correct?

4         MR. PATTON:  Correct.

5         THE COURT:  Did I take you afield of anything else

6    you were planning on bringing up?

7         MR. PATTON:  I want to talk, if I may, about the

8    underlying ineffective assistance of counsel claim.

9         THE COURT:  And how it relates to this?

10        MR. PATTON:  Correct.

11        THE COURT:  If you get passed it on Schlup, then I

12   have to decide whether counsel was ineffective for not having

13   found this information at trial?

14        MR. PATTON:  Correct.

15        THE COURT:  If you get passed Schlup, doesn't that

16   kind of follow?

17        MR. PATTON:  Yes, I agree.  But they are distinct

18   steps.  And I would, in support of that --

19        THE COURT:  It would seem to me you would have

20   difficulty with the prejudice part?

21        MR. PATTON:  Correct.  Whether or not it was

22   reasonable not to get the records, I'd submit to you this.

23   Mr. Logue testified that he received Petitioner's Exhibit WW,

24   which is the fax from Hermitage House to Bob Blakely showing

25   the dates of the home visits.  So he knew that the prosecutor

76

1    had that.  And at least when the prosecution amended the

2    charging documents to change the dates, to match up with the

3    dates that were on Petitioner's Exhibit WW, and knowing, as he

4    testified he did, that Jim had home visits to both Karen's

5    house and to Judy's house, it was absolutely critical that he

6    investigate and get the records from Hermitage House to find

7    out which sister these home visits were to.

8         THE COURT:  Or to at least have asked the

9    question -- he didn't testify that he asked the question?

10        MR. PATTON:  Correct.  He testified that he talked

11   with someone at Hermitage House.  Well, I'll tell you flat out

12   that I don't believe he talked to anybody at Hermitage House.

13   He said he talked with Bill Madura.  We know from the record

14   that Bill Madura never worked at Hermitage House.  Dale Wellman

15   was Jim's counselor the whole time Jim was at Hermitage House.

16   And Dale Wellman said I never talked with Logue.  Logue said

17   the person at Hermitage House told him, Logue, that Hermitage

18   House knew Jim was really going to Karen's house when he was

19   supposed to be going to Judy's house for home visits.  Wellman

20   categorically denied that he ever believed that.  And so he

21   would have never told anybody that.  But even if you accept

22  that, Logue's testimony that he talked with someone at

23  Hermitage House, the most he said was, well, someone at

24  Hermitage House told me the stuff in the records wouldn't be

25  very helpful.  As an attorney you cannot base your decision as

77

1  to whether or not to get records on someone else's

2  interpretation of whether or not those records are going to be

3  helpful or not.  And from Logue's perspective, if the important

4  things were the dates in making sure which home visit, which

5  sister Jim went to on home visits, it wouldn't matter if the

6  stuff from Hermitage House showed that while Jim was at

7  Hermitage House he wasn't a very good kid, he wasn't following

8  the rules, that's not why he was trying to get the records.

9        THE COURT:  Would it have affected Mr. Logue at all

10  what would have been redacted off the bottom of Exhibit WW?

11        MR. PATTON:  Number one, I didn't redact that, that

12  was the way I received it.

13        THE COURT:  Have you seen that unredacted?

14        MR. PATTON:  I have not seen it unredacted, but what

15  I saw in the Juvenile Court file was that page with the

16    redaction, with the original redaction with the black magic

17    marker.  As a defense attorney there is absolutely no way you

18    can say well, I'm not going to investigate, these people think

19    my client's guilty.  That's the whole reason your his defense

20    attorney.  Your job is to defend him of the charges, even if

21    you think he's guilty.  I mean there is absolutely no way that

22    that statement should have affected his investigation at all.

23         THE COURT:  Do you agree that he couldn't go speak

24    to Ms. Jaworski?

25         MR. PATTON:  No, he could have spoken to her.


                              78


1         THE COURT:  But he could have spoken with Ms. Tice?

2         MR. PATTON:  Yes, if he wanted to.  In fact, he

3    testified at trial he thought he had spoken with one of the

4    sisters.  He referred to her as the other sister.  But both

5    Karen and Judy testified to that, that Attorney Logue never

6    spoke to them.  The people, he also said he spoke to Bill

7    DeSantis, that DeSantis confirmed that Jim was having home

8    visits during that summer.  On cross-examination Logue admitted

9    that DeSantis didn't remember any of the exact dates that the

10  home visits occurred.  Logue said he spoke with Jim's mom, Pat

11  Tice, about the dates of the home visits.  But Pat Tice had

12  been ordered by Judge Anthony in the juvenile case not to have

13  any contact with Jim.  So she wouldn't have any basis of

14  knowledge as to whether or not he had home visits or not.  I

15  mean it was absolutely, nothing he said he did, even if you

16  believe he did all this, made it so that he should not have

17  gotten those records.  If you look at the Supreme Court case of

18  Rompilla v. Beard, it is 125 Supreme Court, page 2456, 2005,

19  it's actually out of the Third Circuit.  They find defense

20  counsel ineffective because even though defense counsel had a

21  forensic psychiatrist and a forensic psychologist and another

22  mental health expert evaluate the defendant, they did not go to

23  the courthouse and look in a court file of the defendant's

24  prior conviction to find out what was in that file.  Because

25  they had notice, the defense attorneys had notice that one of


79


1  the aggravating factors the prosecution was going to present at

2  the death penalty phase, was that the defendant had a history

3  of prior felony convictions that showed -- I forget the exact

4    wording, a history of prior felony convictions indicating the

5    use of threat of violence.  That's an aggravating factor under

6    the Pennsylvania death statute.  The prosecution had given

7    notice that we're going to use the fact of his prior rape

8    conviction to prove up that he has this history.  The defense

9    attorneys never went to the courthouse and looked through that

10   file to see what was in there.  If they had, they would have

11   found a wealth of information about the defendant's horrible,

12   horrible childhood, and information about his parents.

13   Information that was never presented to the forensic

14   psychiatrist and psychologist that had interviewed the

15   defendant.  The Supreme Court said it was unreasonable for the

16   attorneys not to go look at that court file because they knew

17   the prosecution was going to use information from that file to

18   prove up their case.  Well, Mr. Logue, if he received

19   Petitioner's Exhibit WW, which is the fax from Hermitage House

20   to Mr. Blakely, and knew that that was what the prosecution was

21   basing their dates on to break up these charges into two

22   distinct groups, he absolutely had a duty to himself to look at

23   those files, get those files.  We presented evidence that said

24   all you have to do is get a signed release from Jim and

25  Hermitage House would have turned them over, they were

80

1  available to him, and in fact you found, you denied our Brady

2  claim because you found that the records were always available

3  to Mr. Logue.  He had to get them and see what was in them.  If

4  nothing else, to double check on the prosecution's belief that

5  these were the dates of the home visits.  Plus, when you throw

6  in the fact that he knew there were home visits to the two

7  different sisters and Exhibit WW doesn't distinguish between

8  which sister the home visits were to, there's absolutely no

9  way --

10        THE COURT:  Would he be required to have done that

11  if there weren't two separate charges, if it was all one?

12        MR. PATTON:  I think, yes.

13        THE COURT:  If the dates weren't at issue and

14  everybody said he was there a certain weekend --

15        MR. PATTON:  If everybody agreed that he was there

16  during the timeframe charged, then the dates themselves don't

17  become that critical.

18        THE COURT:  They're not critical in that second

19   one --

20        MR. PATTON:  The 3207 charge, correct.  The exact

21   dates aren't critical because --

22        THE COURT:  The fact this is a separate charge

23   brought with a separate conviction makes this something that

24   the attorney was required to do?

25        MR. PATTON:  Right.  It's not real difficult to

81

1   understand why the Commonwealth charged it the way they did.

2   It's very obvious why they charged that way.  And it's not

3   improper for them to do that.  They knew they were going to

4   have problems with a young victim establishing exact dates.

5   So that's why they charged one large chunk of time.  But then

6   they try and isolate the last one and hit that one as separate,

7   so that we can get multiple convictions.  It is absolutely --

8        THE COURT:  How does that change the sentencing?

9        MR. PATTON:  How does it change the sentencing --

10   Jim would facing a sentence of three and a half to seven years

11   on the attempted rape charge from 3207.  He received probation

12   on the corruption of minors and indecent assaults that were

13   also charged in 3207.

14        THE COURT:  Instead, he was looking at a maximum of

15   14 years?

16        MR. PATTON:  Yes.  He received the same sentence in

17   3207 and 3206, made consecutive to one another.  Except the

18   probation separate cases weren't made, I don't believe they

19   were made consecutive to one another.  He got three and a half

20   to seven on each consecutive, to get 7 to 14.  Judge, if a

21   defense attorney knows there is a source of records out there

22   that has something to say about their client during the time

23   period that's at issue, you go and get it.  Nine times out of

24   ten maybe this stuff you get isn't going to be helpful for you.

25   But you have to get it to decide whether or not it's helpful.


                              82


1    That's why in Strickland, when the Supreme Court is talking

2    about saying if it's a tactical decision, then it's basically

3    impervious to review.  But if you haven't investigated fully,

4    then the reasonableness of that decision is based on the

5    reasonableness of your failure to investigate.  In the Supreme

6    Court, the Rompilla case, Wiggens v. Smith, which is 123

7   Supreme Court at page 2527, which reverses the death penalty

8   sentence.

9          THE COURT:  As to the death penalty, there is so

10  much at stake, they make all these pronouncements.

11         MR. PATTON:  Your Honor, they're doing them based on

12  Strickland v. Washington, saying this is the standard set by

13  Strickland v. Washington.  Those cases, they're failure to

14  investigate.  The court is saying --

15         THE COURT:  You know the circuit finds things

16  ineffective on a death penalty case that they wouldn't find

17  ineffective on a non-death penalty case.

18         MR. PATTON:  Well, you can argue that that's true,

19  but they're applying the same standard as set out in Strickland

20  v. Washington that you're applying.

21         THE COURT:  And I understand what your argument

22  about when it's not a tactical decision.  But, on the other

23  hand, there's some line that has to be drawn, what

24  investigation needs to be made, what documents need to be found

25  and where do you draw the line.

83

1          MR. PATTON:  Sure, you always have to draw the line

2     somewhere.  But what the Supreme Court is saying is hey, if you

3     have knowledge that records exist out there and they may be

4     helpful to you, you have got to follow that lead up.  You have

5     to go see what's there.  In Wiggins they found a failure to

6     investigate, even though the defense attorneys had a prior

7     state presentence investigation report that had some family

8     history, indicating that the petitioner had had a bad

9     childhood.  They also had the Department of Social Services

10    records that indicated that he had some problems at school and

11    problems elsewhere.  Then they didn't follow-up and go get

12    other documents that were referenced in there, like school

13    records and other kinds of records.  And the Supreme Court said

14    that is ineffective, because once you see the PSI, once you see

15    the Department of Social Services records, even though that

16    gives you some information about the defendant, it also

17    indicates that there are other things out there, other records

18    out there that can give you insight on the client.  And you

19    cannot simply decide I have enough, I'm not going to get

20    anymore.

21          THE COURT:  So if I receive a fax from Hermitage

22    House that tells me these were the dates that the defendant was

23  on a weekend visit, then that tells me there are records from

24  which that was drawn?

25          MR. PATTON:  Absolutely.  And if you know on top of

84

1  that that there were home visits to two different homes, and

2  the exhibit that you have received doesn't differentiate

3  between home visits to one sister versus the other, then it's

4  even more critical that you get the records from them, number

5  one, find out what records say he was there on these dates.

6  And, number two, was he really, which sister's house was he at

7  on those particular dates.  And Mr. Logue testified that he

8  knew Jim had home visits, he knew Jim had home visits to both

9  Karen's house and Judy's house, and he knew that there were

10  records at Hermitage House with regards to those home visits.

11  And he didn't get them, that is inexcusable and absolutely

12  unreasonable.  No reasonable attorney would have done that.

13          THE COURT:  And you didn't expect that he would

14  testify that he knew those things?

15          MR. PATTON:  No.  I talked to the man twice.

16          THE COURT:  You've laid some heavy charges in your

17  objections?

18      MR. PATTON:  I sent him this twice.  I spoke to him

19  after I sent him this twice.  And his statements were I can't

20  find the file, I don't remember anything.

21      THE COURT:  Okay.

22      MR. PATTON:  And what other witness has backed up

23  the claim that somehow Mr. Logue was told that when Jim was

24  supposed to be going to Judy's house for home visits, he was

25  really going to Karen's house for home visits.  I mean Jim


85


1  denied it.  Okay, Jim's not an impartial witness.  Wellman

2  denies it.  He said if that was going on, we would have

3  documented it, it would have been a violation of policy.  Judy

4  came in here and told you that when he came to my house, he

5  stayed at my house.  Karen came in and testified that he did

6  the exact same thing.  And Karen said Jim never showed up at my

7  house on any time when he was not there on an approved home

8  visit.  None of the evidence has supported that.  The sources

9  for the information have denied, both Jim and Mr. Wellman have

10  denied that.  Karen and Judy both said Logue didn't talk to

11  them, so he couldn't have got the information from them.  Had

12  he talked with them, they would have told him look -- Judy

13  would have said when Jim came to my house, he was at my house.

14  And she goes so far as not going to sleep until after he goes

15  to sleep, and then checking on him throughout the night.

16      THE COURT:  My eyes are glazing, okay.

17      MR. PATTON:  I know I have leveled heavy charges

18  against Mr. Logue and I don't do it lightly.

19      THE COURT:  You're rough on me, too.

20      MR. PATTON:  Yeah.  But all I can tell you is what

21  my first boss as a federal defender told me was if you're going

22  to be a bear, be a grizzly.

23      THE COURT:  I understand you were passionate about

24  your position.  Can I say you've been through what you need to

25  be through?

86

1      MR. PATTON:  Yes.

2      THE COURT:  All right, we'll take a 10 minute recess

3  and be back at one.

4      (Recess from 12:50 p.m.; to 1:05 p.m.)

5          THE COURT:  All right, Mr. Burns.

6          MR. BURNS:  Thank you, your Honor.  Your Honor, all

7     we really have to go on here is the record.  The issue here I

8     think really is very simple, at least I like to keep it simple.

9     At this petitioner's trial back in 1999, his defense was yes, I

10    was at my sister's house, but I didn't do it.  His defense was

11    I didn't do it.  It was not an alibi defense.  And that's how

12    he testified.  Page 53 of the trial transcript under

13    cross-examination by Assistant District Attorney Vogel at the

14    non-jury trial that was held on October 6, 1999, he stated

15    that -- he had a conversation with his sister a couple of weeks

16    before August 22nd about the possibility of moving in with her.

17    And under cross-examination he said, he testified that all of

18    the information regarding the dates was correct.  He was asked

19    at line 6 on page 54, Question:  "What you don't agree with is

20    what Jennifer said happened up in her bedroom during the course

21    of the summer, is that correct?"  And the answer was "Yes."  So

22    his defense at that time was yes, I was there, but I didn't do

23    it.  And as the court has pointed out, he didn't make any

24    claims in any of his state court appeals that he was not at his

25    sister Karen's house on the weekend of August 8th and August

1   9th and 10th.  The timeframe of the incidents were resolved by

2   the judge at the trial, that is what the Superior Court said.

3   And Attorney Logue at the evidentiary hearing testified that

4   the defendant admitted to him that he was in fact at Karen

5   Jaworski's house on the weekend of August 9th and 10th of 1997.

6   And at the evidentiary hearing Mr. Wellman from Hermitage House

7   testified that no one physically checked on the petitioner's

8   visitations to make sure that he was at the proper house.  And

9   they could not guarantee that phone checks occurred.  Now, the

10   defense states that Mr. Wellman believed that the defendant was

11   at the house where the victim was staying and that he had no

12   belief that the defendant was going to Karen's house, but he

13   didn't really know for sure.  The bottom line here, judge, is

14   that nobody really knows for sure where Mr. Tice was on the

15   weekend of August 9th and 10th, 1997.  Mr. Tice remembers that

16   he had visits to Judy's and Karen's homes during that time

17   period.  But he has no specific recollection of which sister's

18   house he was at on any given weekend.  Now, after apparently

19   based on some alleged inconsistencies that arose from the

20  testimony of Dr. Schober, that allegedly brings into question

21  the timeframe of the incidents, now the defendant is saying,

22  wait a minute, I really wasn't there on that weekend.  I wasn't

23  at Judy's house.  And this is a new defense, judge.  This is a

24  new defense that we're hearing for the first time.  He's trying

25  to switch his defenses, now the defendant is saying I wasn't

88

1  there.  And these records from Hermitage House will prove I

2  wasn't there.  And if only my attorney had investigated and

3  gotten these records, then maybe the result of my trial would

4  have been different.  But that's, of course, not the standard

5  here.  The standard is can he say that no reasonable juror

6  would have found Mr. Tice guilty beyond a reasonable doubt if

7  they had heard the extra evidence.  The answer to that question

8  obviously is no.  This is new defense, this alibi defense and

9  I'll talk about this more in a minute, was not consistent with

10  what we argued at trial.

11        THE COURT:  Even if we separate the two counts, the

12  two informations?

13        MR. BURNS:  Right.

14          THE COURT:  All right.

15          MR. BURNS:  Because I don't see anything that would

16  call into question Mr. Tice's conviction on either of those two

17  docket numbers.  But the bottom line, judge, is that Hermitage

18  House records do not show, do not prove that he was not at

19  Karen's house or Judy's house on the weekend of August 8th or

20  9th and 10th of 1997.  All they show allegedly is that he was

21  not at Hermitage House.  If you look at Exhibit WW, it gives

22  the dates that he had home visits, and that includes August 9th

23  to the 11th.  But it doesn't say which sister he was visiting.

24  So these records, although, the defendant wants you to believe

25  that they do, or the petitioner, these records don't prove that


89


1  he was not at Karen's or Judy's house on the weekend of August

2  9th and 10th of 1997.  All they show is that he was not at

3  Hermitage House.  And that's simply not enough to meet the

4  standard.  Now, you will recall Mr. Logue's testimony that the

5  defendant admitted to him that he was at Judy's house on the

6  weekend in question.  He wasn't disputing that, he wasn't

7  denying that.

8          THE COURT:  He didn't dispute it, I don't know that

9    he testified he was there.

10          MR. BURNS:  So based on that, and you heard Mr.

11    Logue's testimony at the evidentiary hearing, he did not find

12    it necessary to investigate and obtain the records from

13    Hermitage House because there was no question of an alibi

14    witness because the defendant admitted that he was at Judy's

15    house.  And so Mr. Logue didn't find it necessary to obtain

16    records that could possibly support an alibi defense when the

17    defendant was not presenting to Mr. Logue any alibi

18    information.  Now, even if these records had been introduced at

19    trial --

20          THE COURT:  But you agree Mr. Logue knew that he was

21    seeing both sisters on alternate weekends?

22          MR. BURNS:  Attorney Logue knew that, yes.  Now, the

23    records, as I said before, as Mr. Wellman from Hermitage House

24    admitted, that he couldn't guarantee that the phone checks

25    occurred and that these records were not a hundred-percent

90

1    accurate.  They didn't prove that the petitioner, Mr. Tice, was

2   at the assigned house, they couldn't keep track of that.  And

3   so, basically, the defendant is trying to bolster or revive the

4   testimony of Hermitage House personnel.  But Mr. Wellman

5   admitted that the records were not a hundred-percent accurate.

6   They couldn't keep, they could not be a hundred-percent certain

7   of the defendant's whereabouts.  And so now we have the

8   testimony from Karen and Judy.  What new testimony do we have

9   today.  We have testimony from Karen and Judy that says, to the

10  best of my recollection, Jim was at my house when he was

11  supposed to be and he didn't go anywhere else.  But that

12  doesn't really help Mr. Tice.  Because Mr. Tice during his

13  trial admitted that he was at Judy's house on the weekend in

14  question.  He was either at one sister's or the other.  But

15  their testimony doesn't really help for the additional reason

16  that, again, nobody knows for sure where Mr. Tice was the

17  weekend of August 9th and 10th, 1997.  So the testimony of the

18  sisters doesn't help us.  And these records don't really help

19  us to solve that problem.  And, as I said, basically, this is

20  now we're switching defenses.  This now an alibi defense, the

21  defendant is now saying I wasn't there.  It's really not fair

22  to impose on Mr. Logue a duty to obtain information regarding

23  an alibi defense when the defendant was not asserting an alibi

24  defense.

25       THE COURT:  That's up to Mr. Logue to figure out


                                91


1  what the defense is.

2       MR. BURNS:  Basically, what the petitioner is asking

3  Mr. Logue to do is to basically investigate every possible

4  defense, even though there is no plausible evidence of that.

5  He's asking Mr. Logue to say well, my client is telling me that

6  he was at Judy's house on the day in question, but he didn't do

7  it.  But maybe he's wrong about that, just in case he is I

8  better call Hermitage House and get all those records, maybe

9  they will show that he wasn't at Judy's house or Karen's house

10  and maybe they'll prove or support an alibi defense.  I don't

11  think the case law requires Mr. Logue to go that far.  Nor does

12  it suggest that even if we have this information, even if we

13  have the records from Hermitage House and the testimony of

14  Karen and Judy, that's taken into consideration with everything

15  else that's on the record, that would not cause one reasonable

16  juror to conclude beyond a reasonable doubt or not to conclude

17  beyond a reasonable doubt that Mr. Tice was guilty.

18        THE COURT:  We're mixing up the tests, though.

19   I have to determine first that a reasonable juror would have

20   convicted him beyond a reasonable doubt.  And if we get to

21   that, then I have to decide whether Mr. Logue should have

22   investigated and, therefore, if he didn't, he would have

23   violated the defendant's right to counsel.  So you're saying we

24   can't even get passed the first one because this would not

25   account for an acquittal on that charge?


92


1        MR. BURNS:  Right, we don't even get to the second

2   test, judge, is my argument.  Because he hasn't satisfied the

3   first test.  Now --

4        THE COURT:  But it's beyond a reasonable doubt, I

5   mean here's the doubt we're sticking in the jury's mind.  We're

6   sticking in the jury's mind he may not have been there that

7   weekend.  Does he have to prove that he wasn't or just stick in

8   the jury's mind he may not have been there that weekend, is

9   that reasonable doubt?

10        MR. BURNS:  Well, I think the problem, judge, is

11   that contradicts what he testified to at trial, I would argue.

12   At trial he says yeah, I was at her house, I stayed there, I

13   babysat.  In fact if you look at look the trial transcript, he

14   says that he babysat and that if you look at, let's see here --

15          THE COURT:  He starts on page 48.

16          MR. BURNS:  He says that Mr. DeSantis, Karen's

17   boyfriend, would spend the night.  By the way, that's contrary,

18   at least somewhat contradictory to what Ms. Jaworski testified

19   to.  He testified that on page 51, that he would babysit the

20   children.  Again, that is contrary to what Ms. Jaworski

21   testified to.  And he was asked on line 19, would Karen and

22   Bill DeSantis be gone out of the house for an extended period

23   of time?  And then the answer was yes.  On page 52 at line 9,

24   he says they went up to Florida and stayed for a while.  So the

25   petitioner testified at his trial that he was babysitting the


93


1   children, that his sister and her boyfriend were gone from the

2   house for, at least in the words of the transcript, extended

3   periods of time.  That would be contradictory to the testimony

4   that was given today.  So the court obviously has to determine

5   and weigh the credibility of the testimony that was represented

6    today vis-a-vis the testimony of the petitioner at the time of

7    his trial.  But as far as the standard, I believe the

8    petitioner cites the Schlup case in support of his argument.

9    That's not really analogous because in that case there were

10   eyewitnesses who stated that they had seen the defendant in

11   that case -- eyewitnesses who testified that the defendant was

12   not in the location where he stated he was when the crime

13   allegedly occurred.  We don't have that here, we don't have any

14   eyewitness who can state with any certainty no, James Tice was

15   not at Judy Tice's house.

16          THE COURT:  But it is a similar idea, the issue is

17   that Schlup is remarkably similar in the fact that we're

18   talking about not being at the scene of the crime.  So Schlup

19   gives me the standard, it also gives me a little bit of a

20   similar situation.  And I think I have -- Mr. Patton gave me

21   for the quote that tells me that it's not -- I'm going to get

22   this wrong, that tells me that it's not a matter of redoing the

23   trial, instead it's a matter of deciding now on the credibility

24   of some of the testimony.  And that I can do that in hindsight,

25   which is something I never do on review as you know, we never

1   do as courts.  So if I can do that and substitute the

2   credibility, and say if I find the testimony of Ms. Jaworski

3   incredible at trial in light of her testimony today, does the

4   Schlup standard mean that I have to say that no reasonable

5   juror would have convicted Mr. Tice?

6          MR. BURNS:  Well --

7          THE COURT:  I mean that's the standard, would that

8   difference alone bring enough reasonable doubt to a reasonable

9   juror?

10          MR. BURNS:  If you're specifying, if you're zoning

11   in on one witness or one witness's testimony, I don't think you

12   can zero in on one witness's testimony and say based on the

13   testimony of Ms. Tice or the contradictions between her

14   testimony at trial and her testimony today, based on that, I

15   don't think any reasonable juror would have found him guilty.

16   I think you have to look at the whole record.  As far as the

17   standard to be used, there's just a few cases that I was

18   looking at.  I started with a case you are familiar with,

19   that's Slutzker v. Johnson.  And in that case the Third Circuit

20   ended its opinion by saying that, basically, we're not going to

21   reach the ineffective assistance claim because our legal

22   standards in this area are somewhat unsettled.  It talks about

23   the Rompilla case, saying that is on review by the Supreme

24   Court.

25          THE COURT:  Rompilla is the death penalty case?


95


1          MR. BURNS:  Right.  As Mr. Patton stated, then the

2   Supreme Court case decided Rompilla a few months ago.  As we

3   all know, that's a death penalty case.  Where the counsel did

4   not thoroughly investigate the evidence at the sentencing

5   phase.  I would submit that is different from this case.  I

6   would submit that counsel's obligation in a death penalty case

7   is heightened, it's greater than it is in a case like this.  I

8   think the case law seems to suggest that.  That certainly when

9   a man's life is at stake, counsel has a much greater obligation

10   to investigate any possible mitigating evidence.  We certainly

11   have that in the Purcell case right here.  When trial counsel

12   was woefully inadequate in investigating possibly mitigating

13   evidence.  But the Supreme Court in Rompilla tells us what the

14   standard is.  It states that reasonably diligent counsel may

15  draw a line when they have good reason to think further

16  investigation would be a waste.

17       THE COURT:  What about if they didn't do any

18  investigation?

19       MR. BURNS:  Well, I think that no investigation

20  would be insufficient.  Counsel who does no investigation

21  whatsoever --

22       THE COURT:  How much information do you have to know

23  before investigation is necessary, what should have triggered

24  Mr. Logue to seek out the records?

25       MR. BURNS:  I would submit that Mr. Logue is not a

96

1  mind reader.  He's not required to independently determine or

2  somehow define the possibility that maybe Mr. Tice was there.

3  Mr. Tice has to tell him --

4       THE COURT:  I wasn't there.

5       MR. BURNS:  He's got to say, Mr. Logue, I was never

6  there.  I wasn't there on that weekend and I know that, and the

7  records will prove that.  Mr. Tice doesn't have to tell him

8  that, but Mr. Logue would know enough to say, okay, well maybe

9   if he was staying at Hermitage House and he had home visits,

10   I'll go get these records that will prove that.  But if Mr.

11   Tice doesn't suggest that, if he doesn't tell Mr. Logue that he

12   wasn't there, then the case law doesn't require Mr. Logue to go

13   out and investigate defenses that are not plausible.  He

14   doesn't have to go out and investigate every possible defense.

15   I think that's what the case law says.

16          THE COURT:  Mr. Patton told me that these two things

17   which should have made Mr. Logue look for the records.  Number

18   one, he knew and he apparently testified to that at our

19   evidentiary hearing.  He knew that Mr. Tice took turns between

20   his two sisters on these visits, number one, and number two --

21   I forget number two?

22          MR. PATTON:  If he had Petitioner's Exhibit WW,

23   which would show they were using Hermitage House records --

24          THE COURT:  Using the Hermitage House records.  So,

25   therefore, he knew they were looking at records or else they


97


1   wouldn't have had those dates.  The dates came from Hermitage

2   House, Hermitage House didn't pull them out of the air, they

3   had to come from the records.  And, number two, he knew he was

4   going to both sister's houses alternatively.  So that between

5   those he should have looked it up, let me look at those records

6   maybe if I'm lucky he wasn't even at her house.

7         MR. BURNS:  Well, I think that's what petitioner is

8   asking us to do, they're asking us to impose on Mr. Logue a

9   duty to --

10        THE COURT:  From those two items, you don't think

11   that's fair?

12        MR. BURNS:  I don't think so.  We know that he

13   stayed at both sisters' houses, that's not in question.  We

14   know that he was either at one house or the other, that's not

15   in question.  So for Mr. Logue now to be expected to go after

16   evidence that proves that he wasn't at Judy's or Karen's house,

17   I don't think that's reasonable.

18        THE COURT:  Do you agree with me that I could sit

19   here and say to you maybe Mr. Logue was ineffective, maybe

20   under the Strickland standard.  But my thinking is that

21   wouldn't change anything if we don't get passed Schlup, do you

22   agree with that?

23        MR. BURNS:  I'm sorry.

24        THE COURT:  I could tell you today maybe I think Mr.

file:///A|/TICE9-7.TXT

25  Logue was ineffective under the Strickland standard.  But if I

98

1  can't get passed the Schlup standard, I don't care, it doesn't

2  matter, do you agree with that?

3          MR. BURNS:  I agree with that, yes.

4          THE COURT:  You have to get passed the procedural

5  default?

6          MR. BURNS:  Right, you have to get passed both

7  standards.  And my argument is you don't get passed the first

8  one, even if you do get passed the first one, you certainly

9  don't get passed the second one.  I'm glad we're talking about

10  Strickland because I think Strickland helps us, too.

11  Strickland talks about the standard for ineffective assistance.

12  Again, we're talking about reasonably effective assistance

13  given the totality of the circumstances.  Counsel is not

14  expected to have 20/20 hindsight.  Decisions have to be

15  assessed in light of the information known at the time of the

16  decisions, not in hindsight.  Pretrial investigation defies

17  precise measurement.  Counsel has to conduct a reasonably

18  substantial investigation into a line of defense.  And it even

19  says that even if there's more than one plausible line of

20  defense, I note the word plausible, even then counsel is not

21  necessarily ineffective.  Because he has the right to make

22  strategic decisions about which line of defense he's going to

23  choose.

24        THE COURT:  That's always tricky when is it

25  strategy.


99


1        MR. BURNS:  But if his client is saying to him yeah,

2  Mr. Logue, yeah I was there, I admit it, but I didn't do it.

3  Then is Mr. Logue expected to say, well, maybe you weren't

4  there, I'm going to go and get those records.  Why would he

5  expect him to do that.  I don't believe that the case law --

6        THE COURT:  Do you think maybe they just didn't

7  focus on that last one.  The prosecutor focused on that last

8  one, but they didn't.  They were just looking at them all as a

9  whole.  The defendant at the time, the petitioner here, the

10  defendant was just thinking of it as a whole, but he was

11  charged with having done these, having committed these crimes

12  over the course of the summer, he was talking about it in terms

13  of I didn't do it, rather than focusing on separate information

14  on that separate date.

15      MR. BURNS:  Well, my question would be, your Honor,

16  where did he get this separate information.  Why does it not

17  occur to him that he wasn't at that house in the first place.

18  It only occurs to him apparently after the non-jury trial at

19  which Dr. Schober testified, only then does the defendant

20  realize, does the alibi defense arise.

21      THE COURT:  I don't think the defendant thought he

22  wasn't there until Mr. Patton found that record.  I think it

23  never occurred to him that the date was incorrect.

24      MR. BURNS:  But, regardless, the defendant has never

25  denied being at the house in question.


100


1      THE COURT:  At the non-jury trial, that's right.

2      MR. BURNS:  Whether or not the records may show he

3  might not have been there, that just doesn't meet the standard,

4  judge.  I would ask you to take a look at Glass v. Vaughn, 65

5  F.3d 13, and that is somewhat analogous to this case because in

6  that case basically the court is saying -- the Third Circuit is

7  saying that that's a case where the defendant changed his

8  defense.  At the time that he was arrested he gave the police

9  and his attorney an alibi defense, that he wasn't there at the

10  time that the crime occurred.  But at the time of his habeas

11  petition, he offered a new defense.  He said that he had no

12  memory of what happened.  And the Third Circuit concluded that

13  based on all the evidence in the record, that he had not made

14  out a claim of actual innocence.  That they could not conclude

15  that no rational juror would have voted to convict him.  That

16  was a first degree murder case as well.  So I would ask you to

17  take a look at that case, judge.  I believe that's all I have,

18  thank you.

19         THE COURT:  Okay, thank you.  I was going to go back

20  to Slutzker that you had brought up which, obviously, I'm

21  intimately familiar with.  And ask you if you don't feel that

22  at least the ineffective assistance analysis is very similar

23  because in that case the attorney, who is dead, didn't look

24  into -- it is different, but it's similar in the sense that the

25  attorney didn't go after a particular witness, and so we dug a

1   little bit.  Why didn't he go after this witness when this

2   witness had said at one point he had no clue who was coming out

3   to the house.  Couldn't tell who's coming out of the house.  We

4   go back and find a piece of paper that the prosecutor forgot to

5   give them that said she knew exactly that it wasn't the

6   defendant coming out of the house.  So sometimes an

7   investigation can't be bad because we don't have all of the

8   information.  Sometimes we get all of that information later.

9   So do you see that is the case here.  Would Mr. Logue have not

10  been able to find this information out at any rate at that

11  point.  Would he have had no reason to continue digging or to

12  think there was anything else he could look at?

13      MR. BURNS:  You heard his testimony at the

14  evidentiary hearing, your Honor.  I asked him based on what

15  your client was telling you, did you consider it necessary to

16  go look for information that might prove that he wasn't at

17  Judy's house?  He said no.  And besides that, Stretsky is

18  obviously a death penalty case.  And that's if there is a

19  discovery violation.  I think there's a difference between new

20  information when added to what's already on the record may meet

21  that standard.  And evidence that we're not really adding new

22  information because the new information, it doesn't really

23  compliment what's already on the record, it's a whole new

24  defense.  It's contradictory as to what was on the record at

25  trial.


102


1        THE COURT:  Going to Schlup, let me say one thing.

2  Ms. Jaworski did not say today I was wrong, he wasn't at my

3  house.  Do you think that's important, do you think she needed

4  to say that for Schlup?

5        MR. BURNS:  No.  I think what Ms. Jaworski said was

6  I don't know whether he was at my house or not.

7        THE COURT:  Right, but do you think she needed to

8  say he wasn't at my house, do you think it needs to be a

9  recantation to meet the Schlup standard for no reasonable juror

10  to have been able to convict?

11        MR. BURNS:  I don't think -- with her testimony, I

12  still don't think they met the standard, I don't think she

13  would be required to say, to completely recant in order for

14  them to meet the standard today.  Even with her testimony

15  today, I don't think they meet the standard.

16          THE COURT:  Okay.  There was a time when I leaned

17    that way, when I thought to get passed the fundamental

18    miscarriage of justice, you almost needed recantation.  Go

19    ahead.

20          MR. PATTON:  A third reason why Logue needed to get

21    the records from Hermitage House.  Logue testified that when

22    Jim admitted to him, being Logue, that Jim was at Karen's house

23    on the dates charged.

24          THE COURT:  Yes.

25          MR. PATTON:  Logue said those discussions occurred


103


1    in October, November, December, January of '98 and early '99.

2    Well, in October, November, December of '98, and January of

3    '99, up until May of '99, the charge in 3206 had the date

4    charged as August 16th.  And if Jim told Logue I was at Karen's

5    house on August 16th, and then Logue gets information, gets

6    Petitioner's Exhibit WW, showing that Hermitage House says the

7    last home visit is August 9th and 10th, and the Commonwealth

8    changes their charge from August 16th to August 9th and 10th,

9    then that should have been a signal that either the records are

10  wrong or Jim's wrong.

11        THE COURT:  What if he was just going under this, it

12  was sometime around there, you know, Mr. Tice, it was sometime

13  around there, whatever it was, I didn't do it.  And Mr. Logue

14  is focusing then on -- not on which date, the dates are

15  irrelevant in his mind, whether or not this guy did it.  You

16  say the dates are not irrelevant on that one conviction?

17        MR. PATTON:  The dates are not irrelevant when the

18  Commonwealth is trying to break this up to get multiple

19  convictions.  If your client says look, I was there during some

20  of this timeframe, but I don't remember exactly when.  Or if

21  your client, even if you believe Logue, your client says I was

22  there on these specific dates, and then you get information

23  that shows you that your client is wrong because the

24  Commonwealth has changed the dates, because the records show

25  that he didn't even have a home visit on August the 16th, and


104


1  Jim has supposedly admitted that he was there on August 16th,

2  that would be a clue that your client doesn't have accurate

3  memory.  Especially when you're asking him about specific dates

4  more than a year after the dates occurred.  And so it is not

5  too much to ask defense counsel then to get the records to try

6  and figure out when were these home visits.  I've got my client

7  saying he's home on this date, I got the records, this limited

8  amount of information from Hermitage House, saying he was home

9  on these dates.  I've got to figure out what's going on before

10  I can decide what my defense is and how I'm going to present my

11  defense.  Because if your defense is going to be I didn't do

12  it, saying that I wasn't there on a particular date is not

13  inconsistent with that.  You can say look, I didn't do

14  anything, I know I didn't do anything on this date because I

15  wasn't there.

16          THE COURT:  How about this.  In the real world of

17  this prosecution, if Mr. Logue had come up with the information

18  that would have questioned the date on that charge, it wouldn't

19  have waited until obviously trial, it would have been brought

20  up before trial, do you think?

21          MR. PATTON:  I don't think he would have to file

22  this as an alibi notice.  He could have, for the 9th and 10th,

23  just presented the evidence, let the Commonwealth put their

24  evidence on, and then put his evidence on.

25          THE COURT:  And just say he wasn't there then?

105

1       MR. PATTON:  Correct.  Now, even if he was required

2   to file an alibi defense, he could have filed the alibi

3   defense.  The Commonwealth could have either have stuck with

4   those dates or decided we can't prove those dates.

5       THE COURT:  Do you think that this court without

6   actual knowledge, we don't have the records to show he wasn't

7   there that weekend, and as Mr. Burns pointed out, we don't know

8   if he was there that weekend or not, you feel confident he

9   wasn't, but we don't really know if he was there that weekend

10  or not?

11      MR. PATTON:  Petitioner's Exhibit VV, which is the

12  Hermitage House progress report for the period of June through

13  August 15th, specifically says he was at Judy's house on a home

14  visit on the weekend of August 9th and 10th.  So that record

15  specifically states, it says that --

16      THE COURT:  I have it in front of me.

17      MR. PATTON:  The second page of that, in the last

18  paragraph where it says goal of family and objectives, if we

19  read into that -- it's five lines down, it says he also visited

20  Judy on August 9th through 11th.  So while Petitioner's Exhibit

21  WW, which is the fax that Hermitage House sent to Mr. Blakely,

22  which was then passed on to the detectives, doesn't say which

23  sister's house the visit was on that weekend.  Petitioner's

24  Exhibit VV does.  Now, I admit, as we talked about before, at

25  this point in time, neither Karen, nor Judy, nor Jim, nor Mr.


106


1  Wellman can say I have the specific memory that Jim was there

2  on that particular date.  And that probably would have been the

3  case in October of 1999.  They would have said look, this is

4  two years ago, I don't remember specifically what date it was.

5  But the whole point of business records, why they are an

6  exception to the hearsay rule, is that because when a business

7  is involved in conducting its day-to-day business, it has to

8  create paperwork, has to create records, they establish habits

9  that they follow, that insure --

10      THE COURT:  Sometimes they establish the exact point

11  that people can't remember.

12      MR. PATTON:  Exactly, that's the point of keeping

13  business records.  But it's also crucial to keep in mind what

14    you pointed out.  Is that we have to show -- all we have to

15    show is that a reasonable juror would have a reasonable doubt

16    as to whether or not Jim was there on the 9th and 10th.  We

17    don't have to prove with one-hundred percent certainty that he

18    was there.  And if a juror would have heard Wellman's

19    testimony, the information that Wellman used to create this

20    exhibit and, again, at that time he would have had the sign-in

21    logs, which he said he used to make sure it was accurate that

22    he got the dates on the home visits right.  If you would take

23    that, coupled with Judy's testimony and Karen's testimony that

24    hey, when he came, I signed him out and I signed him back in,

25    they made calls to make sure he was there, then I don't think a


107


1    reasonable juror could not have a reasonable doubt about

2    whether Jim was actually there.  So even though our evidence

3    doesn't prove with one-hundred percent certainty that Jim

4    wasn't there, that isn't the standard.  The standard is whether

5    there would be reasonable doubt in a reasonable juror's mind

6    that Jim was there.

7           THE COURT:  Schlup means to me the reason they say a

8   reasonable juror is because they're saying if we give you

9   reasonable doubt, you can't pretend that you don't buy it.  You

10  have to give a reasonable juror the standard.  In other words,

11  if reasonable doubt is shown, you have to say that that juror

12  would have not convicted.  You have to show me reasonable

13  doubt.

14          MR. PATTON:  Correct.  The court was explicit in

15  Schlup saying look, the line we draw between guilt and

16  innocence is reasonable doubt.  The habeas judge has to believe

17  that the jurors would faithfully apply the reasonable doubt

18  standard.

19          THE COURT:  You have to give me reasonable doubt to

20  make it passed Schlup?

21          MR. PATTON:  Right.  I would submit that the people

22  at the Juvenile Probation office, has put this guy into custody

23  to, that handled these kids, multiple kids everyday, they

24  handle this, this is what they exist to do, and to document all

25  this, so they can report to Juvenile Probation, a reasonable

108

1   juror can considering that would have to say look, even if I

2   completely believe Jennifer's testimony, I have a reasonable

3   doubt that these things happened on the date of August 9th and

4   10th.  And I do think it's important for Logue's duty to

5   investigate that.  Even if you believe him that Jim said I was

6   there, well, Jim told him -- that Jim was at Karen's house on

7   August 16th, and when Logue even got Petitioner's Exhibit WW,

8   he should have said something's wrong with that, they're saying

9   your last home visit was August 9th and 10th.  And then when

10  the Commonwealth amended their charges to change from August

11  16th to charging August 9th and 10th, even if before then you

12  could find that, okay, maybe Logue didn't have a reason to

13  look, I don't agree with it, even if you would find that, once

14  those dates change and you're saying geez, even the

15  Commonwealth doesn't think he was there on the 16th, he's

16  telling me he was there on the 16th, something's wrong.  Either

17  Jim's memory is wrong or the Commonwealth's wrong, I need to

18  figure this out.

19        THE COURT:  All right.  Anything further, Mr. Burns?

20        MR. BURNS:  Well, your Honor, the

21  defendant/petitioner was aware at some point that the dates on

22  the information had been changed.  I'm assuming he would have

23  had notice before trial that the date was changed to August

24  10th. The Commonwealth doesn't necessarily have to prove, in

25  order to get a conviction, that the offense was committed on a


109


1  particular date. That's the second thing. And again --

2       THE COURT: So the Commonwealth would not, on the

3  charges on the 9th and 10th, they don't have to prove that it

4  occurred that weekend?

5       MR. BURNS: Well, I believe that they could still

6  get a conviction even if it was not conclusively proven that --

7       THE COURT: I see what you're saying.

8       MR. BURNS: We all know that he's either at one

9  house or the other. I don't think there's any dispute about

10  that. He's either at Karen's house or Judy's house. And the

11  people from Hermitage House said we have reason to believe that

12  when he was scheduled for a visit at Judy's, he may have been

13  going to Karen's. The jury hears that testimony and I think

14  that only bolsters the testimony of the victim that it's quite

15  likely that --

16       THE COURT: You're talking about Mr. Wellman's

17   testimony in the evidentiary hearing?

18        MR. BURNS:  Correct, Mr. Wellman's testimony that

19   yes, either he was at one sister's or the other, even if he was

20   scheduled to be at one sister's, he may have been at the other.

21        THE COURT:  He testified that if they found out he

22   was doing that, he was in trouble?

23        MR. BURNS:  If they found out.  But I asked him on

24   cross, someone has got to tell you that the visits aren't going

25   as scheduled in order for you to take disciplinary action,


110


1    someone has got to tell you about that.  He said yes.  That's

2    not necessarily done.  So I don't believe that Hermitage House

3    records, I don't think they add anything to the defendant's

4    case.  They certainly don't rise to the standard because they

5    don't -- we know that he was at one house or the other.  They

6    don't really conclusively establish that he was not.

7        THE COURT:  All right, thank you.  I've held you all

8    here for a long time.

9        MR. PATTON:  Mr. Wellman specifically testified that

10   he had no belief that Jim was sneaking off, he had no reason to

11   believe that.  All he said is look, it's possible that if he

12   goes to Judy's house, he could go to Karen's.  But not only do

13   we have Mr. Wellman's testimony, you have Judy and Karen's

14   testimony that both unequivocally say that it didn't happen.

15          THE COURT:  Right.  Counsel, I appreciate your time.

16   We'll get to work on this.

17          MR. BURNS:  Thank you, your Honor.

18          MR. PATTON:  Thank you, your Honor.

19

20          (Whereupon, at 1:45 p.m., the proceedings were

21   concluded.)

22                    - - -

23

24

25


                              111


1              C E R T I F I C A T E
               _ _ _ _ _ _ _ _ _ _ _

2

3

4

5      I, Ronald J. bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11

12  _____

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25