IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES ROBERT TICE,             )
                                 )
            Petitioner,     )
                                 )
        v.                 )       **Civil Action No. 03-9 Erie**
                                 )       **JUDGE SEAN McLAUGHLIN**
HARRY WILSON, Warden,     )       **MAGISTRATE JUDGE BAXTER**
                                 )
            Respondent.    )

## MAGISTRATE JUDGE'S

### SECOND

### REPORT AND RECOMMENDATION

## I.     RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be granted as to the crimes charged at No. 3206 of 1998 in the Court of Common Pleas of Erie County, Pennsylvania, which charges crimes alleged to have occurred during the weekend of August 9-11, 1997, and that the petition be denied in all other respects.

The Report and Recommendation issued March 29, 2005 [Docket # 28] is hereby withdrawn.

## II.     REPORT

The instant petition for writ of habeas corpus was filed by a state prisoner incarcerated at the State Correctional Institution at Cresson, Pennsylvania.  Petitioner James Robert Tice is serving an aggregate sentence of 7 to 14 years imprisonment for charges arising out of his sexual abuse of his niece.  Tice was convicted of two sets of charges, one charging sexual molestation occurring between May 13 and August 8, 1997, and the second charging Tice with having committed such offenses on the weekend of August 9-11, 1997.

Tice has filed the instant petition for writ of habeas corpus in which he raises claims which were not presented to the state courts. More specifically, Tice now asserts that trial counsel rendered ineffective assistance in failing to obtain release records from Hermitage House, the facility in which Tice was housed at the time of the offenses. One of these records reflects that Tice was, indeed, on a home visit and away from the facility on August 9-11, 1997, but it indicates that Tice was at the home of another relative that weekend, and not at his niece's home. Thus, it is argued, counsel failed to present a valid alibi defense to the charges that Tice committed offenses during the weekend of August 9-11, 1997.

A.    **FINDINGS OF FACT**

**Procedural History - State Court.**

1.        Charges were filed against Petitioner on October 5, 1998 at No. 3206 of 1998, alleging an assault which occurred on or about August 16, 1998. This was later amended to reflect that the offense occurred on August 9-10, 1997. Charges were filed on October 5, 1998 at No. 3207 of 1998 asserting that assaults occurred at different, unspecified times between May 13, 1997, and August 15, 1997.   These charges were also amended in May 1998, to reflect an ending date of August 8, 1997, rather than August 15, 1997.

2.        Tice was tried before a judge sitting without a jury on October 9, 1999, and found guilty of two counts each of attempted rape, indecent assault and corruption of minors for offenses which occurred more than two years prior to trial.

3.        In November of 1999, at 3206 of 1998, Petitioner was sentenced to two years probation on both the corruption of minors and indecent assault convictions, both of which were run concurrent to the 42 to 84 months of imprisonment on attempted rape. Docket # 17, Exhibit H.  At 3207 of 1998, Petitioner was sentenced to two years probation on the corruption of minors and indecent assault, both of which to run concurrent to the 42 to 84 months imprisonment imposed on attempted rape. Docket # 17, Exhibit I. The two terms of imprisonment were ordered to run consecutively. Docket # 17, Exhibits H and I.

4.      Jennifer J., the victim and Petitioner's niece, was eleven years of age at the time of trial in October 1999 (TT 5)[1].

5.      Jennifer testified that Tice stayed overnight at her house often during the summer of 1997 and that every weekend that he visited he would come upstairs at night, pull down her underwear and "put his private" on hers, and then turn her over and "put it on [her] butt" (TT 9-14). She did not know if his penis ever actually penetrated her body (TT 12). Jennifer testified that Tice had been sexually assaulting her over a period of eighteen months (TT 46).[2] Jennifer testified that each occurrence would last between an hour and an hour and one-half (TT 12).

6.      Jennifer overheard her mother saying that Tice may be moving in with them permanently, and that is when Jennifer told her mother about the assaults (TT 15-16).

7.      Karen J., Jennifer's mother and Petitioner's sister, testified that Petitioner, who was in a juvenile detention facility at the time, visited her home on weekend visits during the summer of 1997, and that the last such visit occurred during the weekend of August 9, 1997 (TT 37).

8.      Karen recalled telling Jennifer that Petitioner might be coming to live with them, and it was at this point that Jennifer told her mother of the assaults (TT 38). This conversation occurred on Friday, August 22, 1997, the day before Petitioner was scheduled to visit again (TT 37).

9.      Tice testified at trial and did not contest the assertion that he was at his sister Karen's home during the weekend of August 9-11, 1997. At trial, on direct examination, he stated generally that he had been at Karen's home during the summer of 1997 on several occasions (TT 48-49).

10.     Tice denied any improper contact with his niece, and testified to having acted as a babysitter for her and her brothers "many" times during that time period (TT 51).

---

[1]  Numerals in parentheses preceded by the letters "TT" refer to pages in the trial transcript which is attached as Exhibit G to Docket #17.

[2]  Jennifer's testimony in this regard is contradicted by the documentary evidence. Tice's first home visit to Jennifer's home was in February 1997; prior to that first home visit, Tice was in a detention facility and was not allowed home visits. The first time that Tice could have possibly assaulted his niece was February of 1997 (making the possible period of abuse six months in length).

11.     On cross-examination, Tice testified that he "came home" from the detention facility once a month to visit his sister, and that he recalled having a conversation with Karen about moving in with her "shortly before" August 22, 1997 (TT 53).  He was scheduled to seek court approval of this proposed move on August 23, 1997 (TT 53).

12.     Tice specifically recalled discussing with Karen the possibility of moving in with them, as reflected in the following excerpt from the trial transcript:

> Q:     When did that take place, do you remember?
>
> A:     That was a couple weeks in August before the 22nd, because I was supposed to come to Court on a Monday.  The 22nd, I believe, was a Friday, and I was supposed to come in front of Judge Anthony on Monday to be released to go to her [Karen's] house.
>
> Q:     So it was just shortly before all of that?
>
> A:     Yes.
>
> Q:     So all of that information is accurate then, you agree with that?
>
> A:     Yes.
>
> Q:     What you don't agree with is what Jennifer said happened up in her bedroom during the course of the summer, is that correct?
>
> A:     Yes.

(TT 53-54).  Tice implicitly agreed that the prosecution's evidence was accurate in all things except for the information concerning Tice's molestation of Jennifer.

13.     A physical examination of Jennifer on September 12, 1997, revealed three injuries to her hymen, one of which the examining physician believed was probably more than six months old, and another which "could be a few weeks old maybe" (TT 62-63).  No estimate was given concerning the date on which the third injury might have occurred (TT 63).

14.     The physician testified that there was, therefore, probably penetration on at least one occasion, which the physician admitted was inconsistent with Jennifer's reports concerning the incidents (TT 63-64).

15.    Following the trial, Petitioner filed post-verdict motions asserting that the trial court improperly applied the Rape Shield Law to prevent evidence concerning a prior sexual assault on Jennifer by her brothers (Docket #17, Exhibit J).[3]

16.    New counsel filed an appeal to the Superior Court in which the following claims were raised:

> I.    The accused should be awarded a new trial because any presumption the trial judge, sitting without a jury, did not consider inadmissible compound hearsay has been rebutted.
>
> II.    It was error to prevent testimony that complainant had a motive for retribution against the accused because he punished her for sexual activity he discovered her engaging in with her brothers.
>
> III.    It was ineffective assistance of counsel to fail to object to and thus agree to the admissibility of inadmissible hearsay of what a patient told a doctor that her mother told her, namely, that there was sexual abuse of her brothers.

(Docket #17, Exhibit N).  The Superior Court affirmed on January 5, 2001 (Id., Exhibit O).

17.    Petitioner next filed a PCRA petition in which he raised several claims.  He asserted that counsel was ineffective for failing to call witnesses or to perform an investigation.  Specifically, Tice argued that the physician who testified at trial placed the injuries at dates which were inconsistent with when Tice had been released for weekend visits.  In his "mini-brief" in support of the PCRA petition, Tice argued that "the crime happened before I came home, and after I came home, but not while I was at home . . .." (Docket #17, Exhibit Q at ¶(B)).

18.    In the same pleading, in an unnumbered section labeled "review on the facts" (sic), Tice stated that the dates placed on the victim's injuries by the Commonwealth's expert witness showed that he could not have committed the crime on August 10, 1999, since the newest injury occurred after that date, and that the "older" injury was "six months old" as of September 12, 1997, which would predate May 13, 1997, the starting point for the other charge of attempted rape[4].

_____

[3]  Neither the transcript of the pre-trial proceeding at which Judge Bozza made this ruling nor the written motion itself are included in the state court record presently before this Court.

[4]  May 13, 1997, was Tice's 18th birthday, making this the first date on which he could be charged as an adult for his actions.  The victim testified that she had been molested by Tice prior to May 13, 1997,

19.     Finally, Petitioner attached a chart to his mini-brief in which he illustrates how he was "home" on August 10, 1997, but that the injury identified by the doctor occurred after that date, and that he was "home" at various times during May, June and July of 1987, but that the older injury occurred in March or April of 1997.

20.     Counsel was appointed to represent Petitioner, and filed a "no-merit" letter dated August 10, 2001 (Id., Exhibit U). Counsel explained Tice's claim of ineffective assistance as being limited to an allegation that counsel failed to present witnesses to establish that Tice's minor nephew committed the assaults, and not Tice (Id.).

21.     After reviewing the proposed testimony of the witnesses, counsel determined that none had relevant testimony to offer. Counsel contacted one of the witnesses who flatly contradicted Petitioner's offer of proof concerning his proposed testimony. Counsel reported that the "crux of the Petitioner's purported defense is to assign some ill motive upon his sister to cause her daughter to implicate the Petitioner in the criminal offense." (Id.). The court permitted counsel to withdraw, and dismissed the petition on August 23, 2001 (Docket #17, Exhibit X).

22.     In his *pro se* brief before the Superior Court, Tice asserted that PCRA counsel was ineffective for failing to pursue his claim that Petitioner "was not the person that [sic] committed the crime charged, because he wasn't there to have committed the crime at the time the crime was alleged to have been committed." (Docket #17, Exhibit AA at 12). Petitioner also argued that he had newly discovered evidence in this respect in that he had reviewed the trial transcripts and realized that the physician's evidence placed the injuries to the victim's hymen at times when Tice was not "home" with his sister, but was instead in a juvenile detention facility (Id., 16-17).

23.     The Superior Court addressed the claim concerning the timing of the assaults vis-a-vis the physician's testimony as follows:

> As best can be determined, appellant is arguing the dates of the alleged assaults, summer of 1997, do not "match up with" the dates on which the medical expert testified the victim suffered assaults causing three identified scars . . ..

---

as well, but the charges in this case were limited to acts occurring on and after May 13, 1997.

(Docket #17, Exhibit BB at 8). The Superior Court rejected this claim on the basis that the issue of the time frame of the events was explored in detail at trial, and was resolved by the trial judge as the trier of fact. Id.

24.     Tice's subsequent petition for allowance of appeal in the Supreme Court of Pennsylvania was returned for improper service on August 27, 2002 (Docket #17, Exhibit DD).


        **Procedural History - before this Court.**

25.     Thereafter, Petitioner filed the instant petition in which he initially raised the following claims:

        1.      Double jeopardy;

        2.      Ineffective assistance of counsel; and

        3.      Insufficient evidence to support the conviction.

(Docket #3, ¶13).

26.     This Court appointed new counsel to represent Petitioner, and an amended petition was filed (Docket #17) in which the double jeopardy and sufficiency claims are abandoned. The sole claims now presented by Tice are a claim that counsel was ineffective for failing to obtain records from the juvenile detention facility where Tice was housed, and that the Commonwealth committed a Brady violation in failing to turn those same records over to the defense in discovery. Specifically, it is argued that the records show: (1) Tice was not on leave from the facility as often as the victim remembered during the summer of 1997; and (2) more importantly, that the records reflect Tice was on leave from the juvenile detention facility during the weekend of August 9-11, 1997, but that he spent that weekend at his sister Judy's home, and not at his sister Karen's house. Hence, it is argued, the records from the detention facility would have provided Tice with an absolute alibi defense to the charge that he committed a sexual assault during the weekend of August 9-11, 1997, and would also offer impeachment evidence concerning the frequency with which he visited his sister during the summer of 1997. The Commonwealth responded to the petition (Docket #19).

27.    After a review of the pleadings in this case, this Court scheduled an evidentiary hearing to address the issues raised in the amended petition.  The hearing was held on September 9, 2004, and the first witness to testify was Anthony Logue, Petitioner's trial counsel.[5]

28.    Mr. Logue testified that he met with Petitioner prior to his preliminary hearing (HT 5)[6].  He recalled discussing possible defenses with Tice prior to trial (HT 6) and obtained discovery from the prosecution (HT 6).

29.    Logue also recalled that Tice had been released from Hermitage House, the group home where he was in custody, during various weekends during the summer of 1997, and that Tice would spend these weekends with one or both of his sisters (HT 7-9).  Logue testified that he did not obtain a release from his client authorizing Hermitage House to release all its records (HT 22).

30.    Attorney Logue testified that Tice recalled being at Karen's house on August 9 and 10, 1997, and that Karen's boyfriend, Billy DiSantis, verified that this was correct (HT 10-11).

31.    Logue testified that he had obtained (from the Commonwealth during discovery) a copy of a faxed document summarizing the list of the dates on which Petitioner was released from Hermitage House for home visits, and that list included the dates August 9-11, 1997 (HT 11-12, referring to Exhibit WW which is attached hereto).  Importantly, this summary does not list to whom Petitioner was released.

32.    On cross-examination, Mr. Logue admitted that he had not been able to locate his office file for this case (HT 13).  He did recall, however, that Tice verified his presence at Karen's home on the specific dates alleged in the criminal information (HT 15).  This discussion occurred sometime in or after October 1998, after charges were filed, and more than a year after Tice's last home visit (HT 27).

33.    Logue testified that he showed Tice a 1997 calendar and went through the dates of the home visits, which Tice verified (HT 28).

---

[5]  Mr. Logue was actually the Respondent's witness, but the parties agreed to take his testimony out of order to accommodate Mr. Logue's schedule.

[6]  Numerals in parentheses preceded by the letters "HT" refer to pages in the Evidentiary Hearing Transcript dated September 9, 2004, and made part of the record in this Court at Docket #25.

34.     Logue testified that he further verified the dates of the weekend visits with Bill DiSantis, Probation Officer Blakely, an unnamed individual at Hermitage House, with Tice's sister Karen, and with Tice's mother (HT 16, 22, 23, 30).

35.     Logue recalled Tice telling him that Tice was at Karen's house **every** weekend he was released from the group home (HT 29).  In light of all of this evidence pointing to the same conclusion, Logue saw no reason to question Tice's recollection of whether he was at Karen's house on the dates in question (HT 37).

36.     The next witness was Robert J. Blakely, presently the Chief Juvenile Probation Officer for Erie County (HT 39).  He testified that Tice's placement at Hermitage House began in February 1997, and was terminated in September 1997, when the Probation Office received information concerning the allegations that Tice had assaulted his niece (HT 42; 47-48).

37.     After his release from Hermitage House, Tice was then placed in a temporary holding facility (HT 43).

38.     Blakely explained that Hermitage House, where Tice was assigned during the time that the assaults occurred, is a "group home situation that deals with . . . mild to mid range delinquents, ages usually between 10 and 18, 19." (HT 46).  Juveniles at the facility are permitted to attend school or work, and may earn home visits as approved by the Probation Office (HT 46-47).

39.     Blakely explained that Tice was approved for visits to his sisters' homes because there were no other placement options, since the court issued a restraining order prohibiting Patricia Tice from contacting her son (HT 49).  See also Exhibits MM-SS.

40.     During the police investigation, Blakely contacted Hermitage House to determine the dates of Tice's home visits from May through August 1997.  See infra, footnote 4.  Exhibit WW, the summary of the dates upon which Petitioner was released from Hermitage House, was the result (HT 50).  Pam Marsh from Hermitage House sent the information to Blakely by facsimile (HT 51).  Exhibit WW was then forwarded to the investigating officers (HT 51).  Exhibit WW is attached hereto.

41.    Blakely was also asked about a Progress Report for Tice, which was prepared by Hermitage House on August 15, 1997.  The Progress Report contains the following information concerning Tice's home visits:

> Jim has maintained contact with both of his siblings, Judy Tice and Karen Jaworski.  The contact has been by phone and a few off-ground overnight visits.  Jim visited his sister Judy Tice on June 6th-8th.  He visited his sister Karen Jaworski on June 13-15th and July 25-27th.  **He also visited Judy on August 9-11. . . .**

(Docket #17, Exhibit VV).  Exhibit VV is attached hereto.

42.    Blakely testified that, although this Progress Report states that Tice was at Judy's house, and not Karen's, during the weekend of August 9-11, 1997, it really indicates only where Tice was "supposed to have been," and that there had been some indication "that [Tice] may have gone to both sisters' [homes] or the sisters may have been involved in some of the logistics to return him home" from his visits (HT 58).

43.    The next witness who testified was Stephen Rial, who works for Specialized Treatment Services (STS), which runs residential treatment facilities for adolescents between the ages of 13 and 18, including Hermitage House (HT 62-63).

44.    Rial explained that family visits for residents involve staff dropping the juvenile off with his family, and then picking the resident up again at the end of the visit (HT 65).

45.    It would be a violation of rules for a juvenile to leave the approved residence during the course of an approved visit (HT 68).  If caught, an offending juvenile would have his home visit privileges revoked (HT 68).  Of course, someone would have to tell the Hermitage House employees that a juvenile had left the approved residence before any disciplinary action could occur (HT 70).

46.    Dale Wellman is a behavioral specialist at Hermitage House, and was Tice's counselor in 1997 (HT 71, 73).  Wellman testified that he does not recall having any conversations with Attorney Logue about Petitioner (HT 87).

47.    Wellman testified that progress reports for individual juveniles, like the one he prepared in which Tice is reported to have been released to his sister Judy's home on the weekend of

August 9-11, 1997, were prepared with the help of documentation including phone logs and visitation logs (HT 77-79, 87).

48.    Wellman further testified that "phone checks" are "supposed to happen" during the visitation weekends, which would involve staff members setting call-in times for the juvenile to check in and to have their adult supervisor (here, one of Tice's sisters) speak to a staff member on the telephone to ensure that the juvenile is at the approved place (HT 79-80).

49.    If made aware that a juvenile was not at the approved place on a visit, Wellman would have documented such information, but would not have necessarily taken any further action (HT 81).

50.    It was Wellman's understanding that Tice might go to both sisters' homes during a weekend (HT 85).

51.    Wellman indicated some hesitance in answering where Tice would sleep during a home visit.  He believes that Tice was required by Hermitage House rules to spend the night during a visit with the sister who had the approved visitation for that weekend (HT 85).  Had he been aware that Tice was sleeping at one sister's house when signed out to the other sister's house, he would have documented that fact (HT 88).  No such notation appears in the Hermitage House files.

52.    On cross-examination, Wellman repeated that no Hermitage House personnel physically checked on Tice's home visitations to determine if he was at the assigned residence (HT 90).

53.    Wellman could not guarantee that any phone checks actually occurred during August 9-11, 1997, or an other weekend visitation (HT 90).  He does not know for a fact whether Tice spent his visitation weekends entirely (or at all) with the intended sister (HT 91), and had no way of verifying the information given by Tice during any phone checks which may have occurred (HT 92). In fact, even if a juvenile failed to call in, and a staff member was unable to contact him by phone at the approved residence, this fact would not necessarily have been included in the juvenile's progress report (HT 94).

54.    Pamela Marsh then testified, and indicated that she is the Assistant Director of Hermitage House Youth Services, having worked there for 29 years (HT 97).  She indicated that had

11

an attorney working for one of Hermitage House's former clients requested records, that such records would have been provided (HT 97). No questions were asked about her knowledge of James Tice, or any involvement she may have had in this case in 1997.[7]

55.    Petitioner Tice then testified on his own behalf. He recalls having home visits to each of his sister's homes prior to the time that he was in Hermitage House, but he cannot recall the dates that such visits occurred (HT 101).

56.    Tice denied ever having "split" his weekends between Judy's and Karen's homes, except on one occasion when he was approved for such a split visit (HT 103-04).

57.    He recalled having visits to both Judy's home and Karen's home during the period of May through August 1997 (HT 104), although he did not presently recall the exact dates. In fact, Tice subsequently testified that he did not remember the exact dates of his 1997 visits even in the October 1998 time frame when he spoke with his trial attorney (HT 104, 109-110, 114).

58.    Tice remembers being arrested in August 1997, within weeks of his last home visit, and that his probation officer informed him of the rape accusation (HT 105-06).

59.    Tice was not immediately charged with molesting his niece, but was instead released from juvenile probation on April 21, 1998 (HT 107).

60.    Tice was thereafter charged in an unrelated burglary, and Attorney Logue represented him on that charge (HT 107).

61.    It was not until over one year later, in October of 1998 that charges were filed concerning Tice's sexual abuse of his niece, and Logue then met with Tice and discussed such charges (HT 108).

62.    Tice recalls discussing with Logue the dates of the alleged encounters, and Tice informed Logue that he was at his sister Karen's house during that "time frame," but did not remember precise dates (HT 109-110).

---

[7]  The Court finds the brevity of Marsh's testimony puzzling since she apparently sent the facsimile transmission to the investigating officers that detailed the dates on which Tice was released on weekend visits, and so had some familiarity with the matter.

63.    Tice testified that he did not have, and never saw, a copy of the Exhibit WW, which is the list from Hermitage House summarizing the dates on which he had been released for weekend visits (HT 110).

64.    Tice denied having looked at a calendar with Attorney Logue during these discussions (HT 111).

65.    Tice asserts that he told Logue to obtain his juvenile probation records because Tice believed he had a valid double jeopardy claim arising from the fact that both juvenile and adult charges had been filed for the same crimes (HT 112).

66.    Tice also denied telling Logue that some of the visit weekends would be split between the sisters' houses, even when such splitting of time was not approved (HT 113).

67.    A review of Tice's trial testimony reveals that he never specifically denied being at Karen's home on any of the weekends in question.  Instead, Tice confirmed his sister's testimony concerning the events leading to his arrest in August of 1997, and denied only that he had, in fact, sexually assaulted his niece. See infra, pages 2-3.

68.    The first evidentiary hearing in this matter concluded with Tice testifying that he told Logue that he was not at his sister's house on some of the dates that were charged, since he was, at such times, "locked up" (HT 120).  This appears to be a reference to the fact that the criminal information originally filed against Tice contained one or more inaccurate dates.  The criminal information was later amended to reflect the dates on which Tice actually was released from Hermitage House (HT 122-123).

69.    Finally, Tice indicated that he does not now recall whether he was, in fact, at Karen's house on August 9-11, 1997 (HT 122).

70.    The parties filed post-hearing briefs (Docket #s 26 and 27), and this Court issued a Report and Recommendation on March 29, 2005 (Docket #28), recommending that the petition be dismissed and that a certificate of appealability be denied.

71.    Objections were filed, and attached thereto were affidavits from both of Tice's sisters (Docket #29).

13

72.    Karen J., the sister whose daughter was sexually assaulted, attested that she has no independent recollection of which weekend Petitioner spent at her home, and had no such recollection at the that time of trial, some two years after the event (Docket #29, Exhibit ZZ).  Her testimony at trial was premised solely upon the prosecution's representation that Tice's last home visit was during the weekend of August 9-11, 1997  (Id.).  Karen also stated that she believes the Hermitage House records to be accurate (Id.).

73.    Both sisters attested to the fact that there were no "shared" weekends between the two sisters' houses (Id.; Exhibit AAA).

74.    In light of these affidavits, District Judge Sean J. McLaughlin concluded that further development of the record was appropriate.  Document # 31.  Accordingly, the undersigned held a second hearing on September 7, 2005, at which Judy Tice and Karen J. testified.[8]

75.    At the second evidentiary hearing, Judith Tice testified that her brother had visits with her during the summer of 1997 while he was at Hermitage House (HT2 6).

76.    Prior to a visit, James Tice would call her and she would give her permission for the visit.  She would drive to Hermitage House with her fiancé and son, and would "sign [Petitioner] out" (HT2 6-8).

77.    Judy recalled signing a document setting forth Hermitage House rules for home visits and that she would be responsible for Petitioner until he was signed back in to the facility (HT2 8).

78.    Judy took her supervisory role seriously, and Petitioner spent each weekend that she signed him out with her at her home (HT2 8-9).  There were no "shared" visits with Karen, who lived 35 miles away (HT2 11-12).

79.    Judy testified that she was never contacted by Attorney Logue (HT2 15), and has no present recollection of the exact dates on which Petitioner visited her home in August 1997 (HT2 25).

---

[8]  Numerals in parentheses preceded by "HT2" refer to pages in the Evidentiary Hearing Transcript dated September 7, 2005 (filed February 8, 2006) and made part of the record in this Court at Docket # 38.

80.    Karen J. also testified that the procedure for Petitioner having a home visit with her during 1997 involved her driving to Hermitage House and "signing [Petitioner] out" in a log kept at the facility (HT2 31). She also would drive Petitioner back at the end of the visit (HT2 33).

81.    Karen testified that Petitioner did not "share" weekends with her sister or anyone else; he stayed at Karen's house each weekend that she picked him up (HT2 34-35). Karen testified that Petitioner did not show up at Karen's house during weekends he was signed out to Judy's house (HT2 34).

82.    Karen testified that she does not presently recall the date of Petitioner's last visit to her house in 1997, and did not recall the dates during the trial in 1999 (HT2 36-37). Karen further testified that she based her trial testimony on the prosecutor's list of home visits provided by Hermitage House (HT2 44-45).

83.    Karen further testified that if she had been shown the Hermitage House Progress Report at issue (Exhibit VV) at trial, she would have accepted it as accurate (HT2 39).

84.    Karen testified that Attorney Logue did not interview her prior to trial (HT2 39).

85.    Karen now recalls that Petitioner visited her house once per month, and her sister Judy's house once per month during 1997 (HT2 53).

86.    Both of Petitioner's sisters have testified credibly concerning their recollections of events.

87.    While neither sister remembers whether Petitioner was actually at her home on any particular date, both recall vividly that each visit began with the pick-up procedure at the facility, whereby Petitioner was signed out, and the each weekend visit ended with a return sign-in procedure at Hermitage House. The sign-in and sign-out logs have not been produced.

88.    The Hermitage House record at issue, the June-August Progress Report (Exhibit VV), was prepared by Dale Wellman by referencing the sign-in and sign-out logs which would have contained the signatures of either Judy Tice or Karen J. (HT 85-87). The Progress Report indicates that Tice spent the weekend of August 9-11 at the home of Judy Tice.

89.    The Hermitage House Progress Report is a reliable source of information concerning Petitioner's whereabouts on the weekend of August 9-11, 1997.

15

90.    Had the Hermitage House Progress Report been presented prior to or during trial, Karen J. would have testified that Petitioner was not at her house on the weekend of August 9-11, 1997 (HT2 39).

91.    Karen J.'s explanation of her erroneous testimony at trial, which appears to confirm that she recalled Petitioner being at her house on the weekend in question, is credible.  She had no independent recollection of the actual dates at the time of trial, and testified consistently  with the notes shown her by the prosecutor on the assumption that the prosecutor had obtained the correct information concerning the relevant dates.

92.    Petitioner's testimony concerning his lack of memory of the precise dates he was at his sisters' homes (HT 104, 109-110, 114) is credible in that he was not charged with the crimes until more than a year after they occurred, and his trial was not until two years after the crimes.

93.    As the Hermitage House Progress Report (Exhibit VV)  has been produced here, this Court finds that it was available at the time of trial and could have been located by counsel had he requested it.

94.    This Court finds Attorney Logue's testimony was contradicted in several regards. Although he had no case file to review, and did not recall many details,

> • Logue testified that he confirmed the dates of the weekend visits with both of Petitioner's sisters, yet each sister testified that Attorney Logue never contacted her.

> • Logue testified that he confirmed the dates of the weekend visits with Petitioner's counselor at Hermitage House, yet Dale Wellman, Petitioner's counselor, does not recall ever being contacted by Logue.

> • Logue testified that he confirmed the dates of the weekend visits with Petitioner by supplying him with a calendar, yet Tice testifies that no such event took place.

> • Logue testified that he confirmed the dates of the weekend visits with Petitioner's mother, yet Petitioner's mother was under a court order preventing her from making contact with Petitioner during the time period in question.

> • Logue testified that he had detailed conversations with Bill Madura of Hermitage House about Petitioner.  (HT 17-23)  However, the testimony of others demonstrates that Bill Madura never worked at Hermitage House, but was Tice's unit counselor when Tice was placed at Specialized Treatment Service which placement ended in early February of 1997.  Exhibits GG-JJ, MM-SS.

16

These inconsistencies between Logue's statements and the other evidence cannot be reconciled, even with an allowance for the passage of time.

## B.     ANALYSIS

### 1.     Exhaustion.

The first issue in any habeas corpus proceeding instituted by a state prisoner is whether the petitioner has exhausted his state court remedies.  Exhaustion requires that the claims presented in the federal court have been presented in substantially the same form to the state's highest court, with identity of both facts and legal theory.  Bond v. Fulcomer, 864 F.2d 306 (3d Cir. 1989).  Even if the claims have been so presented to the state's highest court, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. §2254(c); Castille v. Peoples, 489 U.S. 346 (1989).  And, although the requirement is not jurisdictional, it "should be strictly adhered to because it expresses respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." Landano v. Rafferty, 897 F.2d 661, 669 (1990).  The requirement also recognizes the duty, and ability, of the state courts to uphold federal law, and serves the interest of ensuring a fully developed record in the state court. Id.  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  Finally, a federal habeas court is required to dismiss a petition which contains both exhausted and unexhausted claims. Rose v. Lundy, 455 U.S. 509, 510 (1982); Landano v. Rafferty, supra.

A thorough review of the state court records reveals that Petitioner has never asserted any claim premised upon a failure of his counsel to obtain, or of the Commonwealth to turn over, the records from the juvenile detention facility where he was housed during 1996 and 1997.  Tice never argued in the state courts, as he does here, that he was not at the victim's home during the

weekend of August 9-11, 1997, and that counsel was ineffective for failing to discover and present this defense.  Instead, Tice argued in at least one instance that the medical evidence was inconsistent with assaults having occurred at the times alleged[9].  Thus, the assertion that Tice was not at the victim's home in August, 1997,  was never presented to the state courts.  Further, Tice never raised any type of <u>Brady</u> claim at any time in the state appellate courts[10].  Therefore, neither of Petitioner's claims has been fairly presented to the state courts, and he has failed to exhaust state court remedies with respect to both claims.

Tice, however, does not now possess any means of presenting his claims in the state courts since he has waived those claims, 42 Pa.C.S. §9544(b)(issue is waived if petitioner failed to raise it and the issue could have been raised before trial, at trial, on appeal, in habeas corpus proceeding, or in prior proceeding under PCRA), and the time for filing a PCRA petition has expired, 42 Pa.C.S.A. § 9545(b)(1)(petition, even second or subsequent, must be filed within one year of the time conviction becomes final).  "If a claim has not been fairly presented to the state courts but further state-court review is clearly foreclosed under state law, exhaustion is excused on the ground of futility. <u>See</u>, <u>e.g.</u>, <u>Lines v. Larkins</u>, 208 F.3d 153, 160 (3d Cir.2000);  <u>Toulson v. Beyer</u>, 987 F.2d 984, 987-88 (3d Cir.1993)." <u>Wenger v. Frank</u>, 266 F.3d 218, 223 (3d Cir. 2001).

### 2.    Procedural Default.

Like the exhaustion requirement, the procedural default doctrine is based upon notions of comity and federalism.  The procedural default barrier rests upon the "independent and adequate state grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is

---

[9]  See <u>infra</u> at Findings of Fact 21 and 22, where Tice's PCRA petition is recounted, and more specifically, his argument that the approximate dates assigned to the scars on the victim's hymen by the Commonwealth's expert did not comport with the injuries having occurred while he was "at home" on August 9-10, 1997.

[10]  Trial counsel did make a <u>Brady</u> motion pre-trial, but entered into an agreement with the Commonwealth concerning discovery which rendered the motion moot.

"independent" of the federal question and "adequate" to support the judgment.  Coleman v.
Thompson, 501 U.S. 722, 750 (1991).

      A state's procedural rules are entitled to deference by federal courts, and violation of
a state procedural rule may constitute an independent and adequate state ground for denial of federal
review of habeas claims.  Coleman, 501 U.S. at 750; Sistrunk v. Vaughn, 96 F.3d 666, 673  (3d Cir.
1996).  Violations of a state's procedural rules may constitute an independent and adequate state
ground sufficient to invoke the procedural default doctrine even where no state court has concluded
that a petitioner is procedurally barred from raising his claims.  Glass v. Vaughn, 65 F.3d 13, 15 (3d
Cir. 1995), cert. denied, 516 U.S. 1151 (1996); Carter v. Vaughn, 62 F.2d at 595.


### 3.      Overcoming Procedural Default

      Federal habeas review is not available to a petitioner whose constitutional claims
have not been addressed on the merits due to procedural default unless such petitioner can demon-
strate:  1) cause for the default and actual prejudice as a result of the alleged violation of federal law;
or 2) failure to consider the claims will result in a fundamental miscarriage of justice. Edwards v.
Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

      Tice's failure to raise his claims on direct appeal results in a state court procedural default, as
does his failure to present those claims in his PCRA proceeding and on appeal from the denial of
PCRA relief. See, Evans v. Court of Common Pleas, 959 F.2d 1227, 1230 (3d Cir.1992)
(emphasizing that, to satisfy the exhaustion requirement, "[a] claim must be presented not only to
the trial court but also to the state's intermediate court as well as its supreme court");
Commonwealth v. Bond, 819 A.2d 33, 39 (Pa. 2002)("Even if this Court were to assume that these
two claims of trial error were not previously litigated, they would be waived under the PCRA since
appellant's present theories could have been presented on direct appeal."); 42 Pa.C.S. §9544(b)(issue
is waived if petitioner failed to raise it and the issue could have been raised before trial, at trial, on
appeal, in habeas corpus proceeding, or in prior proceeding under PCRA).  Thus, Tice must
establish cause and prejudice or a fundamental miscarriage of justice for each of the state court
waivers in order to avoid the procedural default bar.

### a)     Cause and Prejudice

To satisfy the cause standard, Tice must demonstrate that some objective factor external to the defense impeded his efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. 467, 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). While ineffective assistance of counsel may constitute cause for such a default, neither a deliberate strategic decision nor an inadvertent failure of counsel to raise an issue constitutes "cause" unless counsel's performance failed to meet the Sixth Amendment standard for competent assistance. Engle v. Isaac, 456 U.S. 107 (1982); Carrier, 477 U.S. at 485-87. Further, cause for a procedural default is not established simply due to a petitioner's failure to recognize a claim. McCleskey, 499 U.S. at 493.

Tice now argues that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. However, this claim cannot form the basis for "cause" because Tice never raised this specific assertion of ineffective assistance as an independent claim in the state courts. Hence, this claim cannot be considered by this Court. Edwards, 529 U.S. at 452 (ineffective assistance claim must first "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."). Further, appellate counsel need not raise every possible claim in order to avoid a claim of ineffective assistance. Sistrunk, 96 F.3d at 670. Thus, Tice has not established cause for his failure to raise his claims on direct appeal.

Further, Tice cannot establish cause for his failure to raise his claims during the state court PCRA proceeding, and this procedural default would act as an independent bar to review of his claims even if he were to overcome the bar imposed by his failure to raise claims on direct appeal. Tice cannot establish cause for his failure to raise his claims during PCRA proceedings by alleging ineffective assistance of counsel because there is no constitutional right to an attorney in state post-conviction proceedings. Pennsylvania v. Finley, 481 U.S. 551 (1987); Murray v. Giarratano, 492 U.S. 1 (1989) (applying the rule to capital cases). Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. See Wainwright v. Torna, 455 U.S. 586 (1982)(where there is no constitutional right to counsel there can be no deprivation of effective assistance)." Coleman, 501 U.S. 722, 752 (1991). Thus, the alleged ineffectiveness of PCRA counsel in failing to raise issues cannot give rise to "cause" for purposes of

procedural default, since, by definition, counsel's performance in a collateral appeal cannot deny Petitioner a "right" to effective assistance of counsel.

It follows, then, that Tice has defaulted each of his claims, and that he cannot establish cause with respect to those procedural defaults.   Because he has failed to establish cause for his procedural defaults, the Court need not consider the question of actual prejudice. See Murray, 477 U.S. at 533.

### b)    Miscarriage of Justice

Although Tice cannot demonstrate the necessary "cause" and "prejudice," this Court may still review his claims if he can show that a "fundamental miscarriage of justice would result from a failure to entertain the claim." McCleskey, 499 U.S. at 495.  This Court may use its discretion to correct a fundamental miscarriage of justice if it appears that a "constitutional violation probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496.  See also Coleman, 501 U.S. at 748; McCleskey, 499 U.S. at 502.  Under the "miscarriage of justice" standard, a petitioner must present new evidence of innocence and persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.  Schlup v. Delo, 513 U.S. 298, 327 (1995).  This is a stronger showing than is required to establish prejudice and is found only in a truly "extraordinary" case.  Id. at 864.  To succeed on a fundamental miscarriage of justice claim, a petitioner must invoke "reliable evidence not presented at trial," Calderon v. Thompson, 523 U.S. 538, 559 (1998), and "show that it is more likely than not that no reasonable juror would have convicted him in light of new evidence presented in his habeas petition." Schlup, 513 U.S. at 327.  It was to this end that this Court has held two evidentiary hearings in this case.

### 1)    The *Brady* claim.

The Court will first address Petitioner's Brady claim, in which he asserts that the Commonwealth should have disclosed to him the existence and content of Tice's own juvenile detention records.  It is manifest from the record in this case, including the testimony elicited during

the evidentiary hearings before this Court, that Tice's records were available to Tice himself prior to

trial.  Indeed, Tice's ineffective assistance claim is premised upon the assertion that trial counsel

could easily have obtained those records had he attempted to do so.  A similar situation was recently

addressed by the Court of Appeals for the Fifth Circuit:

> [Petitioner] contends that the prosecution abridged his due process right by
> failing to provide medical records from the county jail that detailed the
> numerous psychotropic medications he was taking while incarcerated and
> awaiting trial. Due process is violated when the prosecution withholds
> material evidence favorable to the defense. Brady v. Maryland, 373 U.S. 83,
> 87 (1963). The state, however, bears no responsibility to direct the defense
> toward potentially exculpatory evidence that either is in the possession of the
> defense or can be discovered through the exercise of reasonable diligence.
> Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir.1997). Because the records
> to which Bigby refers were available through the exercise of such reasonable
> diligence, a COA should not issue on this claim.

Bigby v. Cockrell, 340 F.3d 259, 279 (5th Cir. 2003) (parallel citations omitted).

The same result applies in this case.  See also, Wright v. Hopper, 169 F.3d 695, 702 (11th

Cir. 1999) ("In light of this and the fact that the State is not required to furnish a defendant with

exculpatory evidence that is fully available through the exercise of due diligence, we conclude there

was no Brady violation."); U.S. v. Pelullo, 144 F.Supp.2d 369 (E.D.Pa., 2001)(denying Brady claim

on basis that evidence could have been discovered by defendant prior to trial in exercise of

reasonable diligence).  Therefore, the asserted Brady claim does not satisfy the manifest injustice

standard since the evidence was not improperly withheld by the Commonwealth but was, instead,

always available to the defense.

### 2)    Ineffective Assistance of Counsel - The Hermitage House records concerning August 9-11, 1997.

Tice also asserts that trial counsel was ineffective for failing to obtain the Hermitage

House records concerning the dates on which Tice was released on home visits.  Tice argues that

those records would have "devastated" the Commonwealth's case against him by establishing that he

wasn't even at the victim's home when the most recent assault occurred on August 9-11, 1997.

In the first Report and Recommendation, reliance was placed on the testimony at trial

where Tice did not contest that he spent August 9-11, 1997 at his sister Karen's house.  Further,

Tice's testimony at the first evidentiary hearing on September 9, 2004 was inconsistent; nonetheless, Tice testified under oath that he couldn't remember now, and that he didn't remember at the time he was charged in 1998, or during trial in 1999, where he spent the weekend of August 9-11, 1997 (HT 104, 109-110, 114).  Tice specifically denied telling his trial counsel that he was at Karen's home on those dates, and again maintained that he simply couldn't remember where he spent that weekend (HT 109-110).

The now key piece of evidence to be considered is the Hermitage House Progress Report, which indicates that Tice spent the weekend of August 9-11, 1997 at his sister Judy's house, rather than at Karen's.  See Exhibit VV.  Mr. Wellman, who was Tice's Hermitage House counselor, testified that the Progress Report was prepared from visitation logs which would have contained the sisters' signatures (HT 85-87).  Further, both Judy Tice and Karen J. have confirmed that Wellman, in preparing his Progress Report, would have had their own dated signatures on a sign-out sheet to inform him where Petitioner spent the weekend in question, and that the information in those records would have accurately reflected where Petitioner actually spent the entirety of that weekend.  Therefore, where initially the Hermitage House record was found lacking in probative force, its importance to this case has changed as the testimony offered at the second evidentiary hearing provides necessary verification of its likely accuracy, and of the effect it would have had if it had been produced at the time of trial.

It is still true that three people who **did** have actual knowledge of Tice's whereabouts on August 9-11, 1997, testified at trial.  The victim testified that Tice molested her several times, with the last time occurring shortly before she told her mother in August 1997 (TT 17).  The charges in this case, however, were not premised upon any specific recollection of the victim concerning the date(s) on which they occurred.  She was 9 years old at the time of the offenses, and had no independent recollection of the dates.  The victim's mother, Karen J., testified at trial that Tice's last visit to her house occurred in August 1997, and she reported her daughter's accusations on August 22, 1997 (TT 36-37).  She has explained that testimony, and has credibly attributed it to her reliance on the prosecutor to have correctly identified the date of her brother's last home visit (HT2 44-45).  Tice himself did not contest at trial that he was at Karen's home on August 9-11, 1997, but now

credibly professes a lack of memory about where he was on those dates, relying instead on the prosecutor's accuracy of them.

Most importantly now, this Court has before it uncontradicted evidence that, had the Hermitage House Progress Report been presented at trial, Karen would not only have testified that she had no ability to contradict it, indeed, she would have testified that she accepts the information in that record over her own imperfect memory of events (HT2 39). In light of the fact that the only other witness was a child whose lack of knowledge of dates was no doubt central to the manner in which the Commonwealth charged this case, this would have, at the least, raised reasonable doubt as to Petitioner's location on the weekend of August 9-11, 1997.

The Progress Report would also have led counsel inexorably to Judy Tice as he would have seen that Petitioner was listed as having been at Judy's house on the weekend in question. It may even have been the case that, in 1999, counsel may have succeeded in obtaining the actual sign-out sheet from the date in question (from which the Progress Report was compiled), which would have revealed Judy Tice's signature. This, in combination with her testimony (available at trial) that Tice was with her the entire weekend each time he visited her, would have been additional and compelling evidence that Tice did not commit the precise crime charged at this count, which was that he sexually assaulted his niece **during the weekend of August 9-11, 1997.**

Petitioner has, accordingly, presented "reliable evidence," which was not presented at trial, and this evidence makes it more likely than not that no reasonable finder of fact would have found him guilty of the charges at No. 3206 of 1998 (a sexual assault occurring on the weekend of August 9-11, 1997), because of the credible reasonable doubt raised by this alibi. Hence, Tice has presented evidence sufficient to satisfy the Schlup standard, and procedural default does not bar consideration of Tice's claim that counsel was ineffective for failing to obtain the Hermitage House records as to the charges alleging events during the weekend of August 9-11, 1997 only.[11]

---

[11]  Importantly for the outcome in this case, this same analysis does not apply to the charges stemming from the earlier dates. Tice has not presented evidence of a fundamental miscarriage of justice as to the charges in general. What he has presented is evidence that he was actually innocent of the second set of charges brought against him, i.e., that he sexually assaulted his niece during the weekend of August

**3)      Ineffective assistance of counsel - Impeachment evidence.**

Tice also argues the detention facility records could have been used to impeach the victim's testimony concerning how often Tice visited her home during the summer of 1997 and over what length of period of time (in that the records would have established that Petitioner could not have been assaulting her over a period of eighteen months).   The detention facility records could have been used to challenge the victim's recollection in this respect.  However, it is, in fact, likely that the victim overstated how often Tice spent the weekends at her home.  The information concerning the frequency of his visits is not sufficiently at odds with the eleven year-old victim's testimony to offer any real impeachment value.   Additionally, establishing that an eleven year-old victim did not have an entirely accurate memory concerning the time frame of the abuse she suffered (i.e., eighteen months versus six months) is far from presenting evidence to meet the high bar of fundamental miscarriage of justice standard, especially given that Petitioner was not charged with abusing her over that extended period of time and the child victim was advised at trial to limit her testimony to events which occurred between May and August of 1997.  Therefore, counsel did not render ineffective assistance in failing to obtain Tice's visitation records with respect to purported impeachment evidence.  Stated another way, even if the detention facility records had been obtained prior to trial, and even if they were used to impeach the victim's testimony regarding both  the period of time over which she was assaulted and the frequency of Tice's home visits, this is not sufficient to convince the Court "that it is more likely than not that no reasonable juror would have convicted [Tice] in light of [the] new evidence" and, accordingly, the miscarriage of justice exception does not apply to this claim. Schlup.

---

9-11, 1997.  The evidence in this case supports a finding of manifest injustice only with respect to those later charges.  In this respect, it is fair to say that the manner in which the Commonwealth charged this case, by narrowing the second set of charges to a particular weekend, compels a finding of manifest injustice with respect to the August 9-11, 1997 charge.

4.    **Merits.**

a)    **Standard of Review under § 2254**

Section 2254 of the federal habeas corpus statute provides a deferential standard of review for federal court review of state court criminal determinations. 28 U.S.C. § 2254. Specifically, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e). Also, a federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1). See, e.g., Williams v. Taylor, 529 U.S. 362, 411 (2000) (explaining interplay between standards for factual findings and legal principles, noting that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

However, Section 2254(d)(1) explicitly limits the scope of deferential review to those claims that were "adjudicated on the merits in state court proceedings."  42 U.S.C. § 2254(d)(1). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 243 (3d Cir.2004), rev'd on other grounds sub nom. Rompilla v. Beard, __ U.S. __,125 S.Ct. 2456 (June 20, 2005).  If the state court has not reached the merits of a claim, and the claim is thereafter presented to a federal habeas court, the standard of review set forth in § 2254(d) simply does not apply. Id. at 248; Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001); Simmons v. Beard, 356 F.Supp.2d 548, 556 (W.D.Pa. 2005).  In such cases, the court should exercise "pre-AEDPA independent judgment."  Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir.2000) ("[U]nder the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only 'with respect to any claim that was adjudicated on the merits in state court proceedings.'  Hence, we exercise pre-AEDPA independent judgment ...."). In this case, Tice did not present his claims to the state courts and, accordingly, there are no state

court findings or legal conclusions to which AEDPA deference might apply.  The pre-AEDPA standard is applicable here.

### b) Ineffective assistance of counsel

In reviewing Petitioner's claim of ineffective assistance of counsel, the now familiar standard for such claims is relevant.  The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).

> Thus the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Fretwell, 506 U.S. at 369 (citing United States v. Cronic, 466 U.S. 648, 658 (1984)).  See also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Id. at 690.  A petitioner carries the burden of proof. Cronic, 466 U.S. at 658.

The first prong of the Strickland test requires a criminal defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be

considered sound trial strategy." Id. at 689.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Id.  To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694 (emphasis added).  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

The allegation in this case is that Attorney Logue failed to perform an investigation into his client's whereabouts at the time of the offense charged.  In this respect, the Supreme Court in Rompilla v. Beard, ___ U.S. ___, 125 S.Ct. 2456 (2005) and earlier in Wiggins v. Smith, 539 U.S. 510 (2003) has offered guidance.  While much is expected of trial counsel, Strickland demands great deference with respect to attorneys' decisions not to pursue a particular inquiry or area of investigation.  Strickland, 466 U.S. at 690.  Further, in making a reasonableness determination, "hindsight is discounted by pegging inadequacy to 'counsel's perspective at the time' investigative decisions are made." Rompilla, ___ U.S. at ___, 125 S.Ct. at 2462 (quoting Strickland, 466 U.S. at 689).  "A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527.  Also relevant to this case is Strickland's holding that:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . ..  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland, 466 U.S. at 691.

Here, while Attorney Logue testified that he believed there was no need to investigate the dates of the alleged crimes, and specifically recalled asking Tice about his whereabouts on the dates in question, there was reason for him to do so, at least with respect to the charges involving the weekend of August 9-11, 1997.  There were two criminal informations filed

by the District Attorney in this case, one charging unspecified dates between Tice's eighteenth birthday and the beginning of August 1997, and the other charging that offenses occurred, in effect, on Tice's last home visit.  Counsel was, or should have been, aware that the Commonwealth amended the criminal information in May 1998, to reflect a different date than originally charged. Counsel was also aware that the charges were not filed until more than a year after his client's last home visit, and that Petitioner had visits with both sisters during the relevant time frame.  While this would not have provided a defense to the charge which did not specify a particular date, it certainly would have been relevant to Tice's whereabouts with respect to the charges limited to the dates of August 9-11, 1997.

Strickland instructs that a petitioner may, by his actions, make counsel's decision not to investigate a particular line of defense a reasonable choice.  Here, however, even if Tice believed he had been at Karen's house in August 1997, counsel should have been led to question whether his client's recollection and the Commonwealth's information were accurate.  Counsel was certainly aware that the Commonwealth got the date wrong initially, that Tice spent time at another location during some of his home visits, and that there was a substantial passage of time between the events and the time the charges were filed.  In this respect, the most natural place to obtain information concerning Tice's whereabouts would have been from the Hermitage House records.  Counsel

conceded that he knew of the existence of records at Hermitage House.[12]   Still, counsel never sought to obtain or review them.

In Rompilla, the Supreme Court stated that "we long have referred [to ABA standards] as guides to determining what is reasonable,"___ U.S. at ___, 125 S.Ct. at 2466, and specifically quoted the following ABA standard with respect to counsel's duty to investigate:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

---

[12]   Q:   All right, did you make an attempt to obtain any other juvenile records from juvenile facilities regarding his detention there and release from detention?

A:   I really can't recall if I did or didn't.  I know I spoke to the counselors at Hermitage House and spoke to other people that [sic] he wanted me to.

Q:   Based on what Mr. Tice had told you during your meetings, did you feel that it was necessary or it would have aided your defense to obtain these juvenile records indicating when he was released?

A:   No.  Based upon that Exhibit WW [the fax summarizing the dates of weekend visits] and going over that with him, and Jim telling me he was there on those dates.  And verifying that, not only with him, again, I believe I spoke to mom and Karen's boyfriend, this Bill DiSantis, who was there a lot of the time, and then speaking with, I believe his name was Mr. Madura from Hermitage House, which corresponded with the dates I have.

* * *

Q:   After you received Exhibit WW from the Commonwealth, you did not yourself go to Heritage House and ask them for all the files, whatever records they had regarding him, is that correct?

A:   Right, I made the phone calls.

(HT 12, 22)

Id., (citing 1 ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-4.1 (2d ed. 1982 Supp.)).  Here, although it may have appeared to counsel at first glance that an alibi defense was not available, he should not have relied upon his client's memory, or lack thereof, concerning his whereabouts on the weekend of August 9-11, 1997, particularly where the charge was date-specific, had been amended by the Commonwealth, and more than a year had passed from the time of the offense to the time the charge was filed.  There is, on this record, no reasonable basis for counsel to fail to take the easy step of obtaining and reviewing the Hermitage House records. Had he done so, he would certainly have located the Progress Reports (and possibly the sign-out sheets) placing Petitioner at Judy's house, not Karen's, during the August 9-11, 1997 weekend.

Having determined that counsel's performance was unreasonable in not obtaining the records, the prejudice prong of Strickland is satisfied for the same reason that the manifest injustice standard was met.  The evidence presented in this Court establishes that, had counsel produced the Hermitage House Progress Report at trial, the Commonwealth's own witness, Karen J., the mother of the victim, would not only have been unable to contradict it, she would have readily conceded that it was more likely to be accurate than her own recollection.  Further, Tice's other sister, Judy Tice, would have offered testimony that Tice was at her house for the entire weekend of each weekend he was signed out by her, again supporting the accuracy of the Progress Report concerning his whereabouts.  Thus, there is a reasonable probability that the outcome at trial would have been different as to the charge involving the weekend of August 9-11, 1997.  Therefore, the conviction on **those** charges must be found to have been obtained in violation of Petitioner's right to the effective assistance of counsel.

### D.     CONCLUSIONS OF LAW.

1.     Petitioner has failed to exhaust his state court remedies because he has not presented the instant issues to the state courts.

2.     Petitioner's claims are procedurally defaulted and he has failed to establish "cause" for his procedural default.

3.      Petitioner has established manifest injustice sufficient to overcome the bar of procedural default with respect to his claim that counsel was ineffective for failing to discover and present a defense premised upon the Hermitage House record that places him at his sister Judy's house on the weekend of August 9-11, 1997.

4.      Petitioner has not established manifest injustice with respect to his remaining claims, and they remain procedurally barred.

5.      Trial counsel acted unreasonably in failing to obtain and review the records from Hermitage House.

6.      Trial counsel's failure to investigate (in seeking the Hermitage House records) prejudiced Petitioner by denying him an absolute defense to the charges that he molested his niece on the weekend of August 9-11, 1997.

7.      Petitioner is entitled to relief with respect to the charges at No. 3206 of 1997, and a writ of habeas corpus should issue as to them.

8.      Counsel's error did not deny Petitioner a fair trial with respect to the other crimes charged and, accordingly, Petitioner is not entitled to relief with respect to the remainder of his state court sentence.


E.      **CERTIFICATE OF APPEALABILITY**

Section 102 of the Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2253(as amended)) codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  Amended Section 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."   Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong..." Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).  A petitioner meets this standard if he can show that the issue "is debatable among jurists, or that a court could resolve the issue differently, or that the question deserves further proceedings." McCracken v. Gibson, 268

F.3d 970, 984 (10th Cir. 2001).  Under 28 U.S.C. § 2253(c)(3), the district court must identify which specific issues satisfy the standard.

A certificate of appealability should be denied.

## III.    CONCLUSION

Wherefore, on the basis of the foregoing, it is respectfully recommended that the instant petition for writ of habeas corpus be granted at to the charges relating to August 9-11, 1997 only, and dismissed in all other respects.

In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

S/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
CHIEF UNITED STATES MAGISTRATE JUDGE

Dated: February 9, 2006

33