IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES ROBERT TICE, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | ) C. A. No. 03-9 Erie |
| | ) |
| HARRY E. WILSON, | ) |
| | ) |
| Respondent. | ) |

**PETITIONER, JAMES ROBERT TICE'S, OBJECTIONS TO
MAGISTRATE JUDGE'S SECOND REPORT AND RECOMMENDATION**

AND NOW, comes the petitioner, JAMES ROBERT TICE, by his attorney, Thomas W. Patton, Assistant Federal Public Defender, and files his objections to the Magistrate Judge's Second Report and Recommendation and Request for Evidentiary Hearing:

Jim has no objections to the Report and Recommendation's (R and R) that his habeas petition be granted with respect to the charges in case number 3206 of 1997. Jim agrees that he showed he suffered a miscarriage of justice, excusing his procedural default of his ineffective assistance of counsel claim, and that he received ineffective assistance of counsel with respect to the charges in case number 3206 of 1997.

Jim does object to the R and R's recommendation that his habeas petition be denied with respect to the charges in case number 3207 of 1997. Jim respectfully disagrees with the R and R's conclusion that he has not shown he suffered a miscarriage of justice with respect to these charges, and, therefore, his procedural default of his ineffective assistance of counsel claim should not be excused. What the R and R fails to understand with respect to the charges in case number 3207 of 1997 is that the records from Hermitage House **establish that someone other**

1

**than Jim sexually assaulted the victim.**  Thus, far from simply impeaching the victim's testimony, the Hermitage House records devastate the Commonwealth's case in case number 3207 of 1997.

## THE RELEVANT FACTS

The facts of the case have been set out in detail in both of Judge Baxter's Second R and Rs and in Jim's objections to the first R and R so they will not be repeated in detail again here. The crucial facts for purposes of these objections are the victim's trial testimony, Dr. Schober's trial testimony, and the dates of Jim's home visits as established by the juvenile court records. Accordingly, those facts are discussed below.

At trial, Jennifer Jaworski, Jim's niece, testified that Jim came to stay at her house "basically every other weekend" during the summer of 1997 and that every time he would stay and spend the night he would sexually assault her. (Petitioner's Exhibit G at 14)[1]  Jennifer testified that Jim had sexually assaulted her for about "[a] year and a half." (Id. at 46)  Jennifer also testified that all the assaults occurred in her bedroom in the house she lived in at 931 West 27th Street in Erie. (Petitioner's Exhibit G p. 7-15)

Dr. Justine Schober testified as an expert for the Commonwealth. Dr. Schober was a pediatric urologist who had examined Jennifer on September 12, 1997. (Id. at 58)  Dr. Schober's physical examination of Jennifer revealed three injuries to Jennifer's hymen.  There was an old healed tear at the six o'clock position of the hymen.  There was also an area where she had a transection of the hymen on the right side where the hymen had healed against the vaginal wall.

---

[1] Citations to Petitioner's Exhibit __, refer to the exhibits attached to the amended petition.  Petitioner's Exhibit G is the transcript of Jim's trial.

There also was a new or recently healing injury on the right lateral wall of the vagina that was still red.  As to the "old" healed tear, Dr. Schober testified that the scar had devascularized which "probably date[d] it older than six months."  As to the new injury Dr. Schober explained that "it's just healing, it could be under seventy-two hours, or sometimes when vaginal injuries get slightly inflamed or infected because there is so much skin flora, like rectal flora around that area, it takes them a little longer to heal if they get infected.  And this one was all red and appeared to have gotten infected as it was healing, and I would say it could be a few weeks old maybe."  (Id at 62)

     Dr. Schober's opinion regarding her exam was that Jennifer gave a history that suggested either trial or intromission or possible intromission with penile penetration of the vagina.  (Id)  When pressed regarding the time the injuries occurred, Dr. Schober explained, "Well, the only thing that I could say is that one of the scars looked like it was – it could have been as old as six months and it could have been older. It could have been older than six months.  And one of the scars looked like it was newer, within a few weeks."  (Id.)  The doctor also added that "there was also probably a third one, which I guess I couldn't really date.  There was an area on the right wall of her vagina where it appeared that the hymen had been transected and was held up against the wall of the vagina, and I really couldn't date that."  (Id.)

     Going back in time a year and a half from August 1997 (because Jennifer claimed Jim had been assaulting her for a year and a half) takes us to February 1996.  In February 1996, Jim was locked up at the Youth Development Center (YDC) in New Castle, Pa.  (Petitioner's Exhibit LL, T. 57) Robert Blakely of Erie County Juvenile Probation explained that there are no home visits from the YDC.  (T. 43) Jim remained at the YDC until August 5, 1996 when he was placed

at Specialized Treatment Services (STS).  (T. 57, Petitioner's Exhibit LL) Jim's first home visit to Karen and Jennifer's house was during the weekend of February 21-23, 1997.  (Petitioner's Exhibit's MM, NN, OO, PP, QQ, RR, SS).  Of importance is the address listed for Karen, 1113 Browns Avenue, Erie, PA 16501.  (Petitioner's Exhibit SS) Again, Jennifer testified that all of the alleged assaults happened in her bedroom at the 931 West 27th Street address.  Stephen Rial from STS testified that before any home visit would occur a staff member from STS would do a home inspection to make sure the home to be visited was a safe environment and that STS staff would drive the juvenile to and from the home visit.  (First Hearing T. 64-65) Accordingly, there is no doubt that the February 1997 home visit to Karen's was to Karen's house on 113 Browns Avenue and not Karen's address at 931 West 27th Street.

The first visit Jim had to Jennifer's house on 931 West 27th Street was  May 9, 1997. (Petitioner's Exhibit UU) Following that home visit, Jim had two more home visits to Karen's house at 931 West 27th Street, one on June 13-15, 1997, and the last visit on July 25-27, 1997. (Petitioner's Exhibit VV)

### THE MISCARRIAGE OF JUSTICE STANDARD

The Supreme Court has recognized that a habeas petitioner can avoid the consequences of a procedural default, even if he can not show cause to excuse the default, if he can show that his case falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." McCleskey v. Zant, 499 U.S. 467, 493-94, 111 S.Ct. 1454, 1469-1470.  One way in which a habeas petitioner can establish a fundamental miscarriage of justice is to prove that he is actually innocent.  As the Court explained in Murray v. Carrier, 477 U.S. 478, 537, 106 S.Ct. 2639, 2649 (1986), "in an extraordinary case, where a constitutional violation has probably resulted in the

conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." The showing of actual innocence allows the petitioner to overcome the procedural default and have the habeas court address his otherwise defaulted claims on their merits. Schlup v. Delo, 513 U.S. 298, 315, 115 S.Ct. 851, 861 (1995).

In Schlup the Supreme Court specifically adopted the Carrier standard for claims of actual innocence. Id. at 326-27, 867. The Court stressed that "the Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt." Id. at 328, 115 S.C.t 867. Accordingly, when a court applies the Carrier standard "the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." Id. Thus, the question is **not** whether Jim is factually innocent. Id. At 328, 115 S.Ct. 868 n.47. The question is whether there is reasonable doubt of Jim's guilt.

"The Carrier standard requires the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 327, 115 S.Ct. 867 (internal quotation omitted) "[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Id. at 329, 868. "It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Id.

It is important to realize that this review is not the equivalent of reviewing the sufficiency of the evidence in support of a guilty verdict under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979). Schlup, 513 U.S. at 330, 115 S.Ct. at 868. The Jackson standard focuses on whether any reasonable juror **could** have found the defendant guilty. The Carrier standard, with its use of the word **would**, "focuses the inquiry on the likely behavior of the trier of fact." Id. "Thus, though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under Carrier. Id. at 330, 115 S.Ct. 869. It was this difference in the legal standards that allowed the Supreme Court to find potential merit in Schlup's actual innocence claim. Id.

Schlup had been convicted of murdering an inmate in a Missouri correctional facility. The evidence against Schlup included testimony from two prison officials who witnessed the murder and positively identified Schlup as one of the murders. Id. at 331, 115 S.Ct. 869. Accordingly, there was certainly sufficient evidence to support Schlup's murder conviction. Id. However, the new evidence presented by Schlup to prove his actual innocence under Carrier (again this is legal innocence, not factual innocence) included sworn statements of several eyewitnesses that Schlup was not involved in the murder and alibi evidence that placed Schlup in the prison dining hall at a time that would have made it impossible for him to have committed the murder. Id. The Supreme Court found that if this new evidence was credited, "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict. Under a proper application of . . . Carrier, petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." Id.

**JIM SUFFERED A MISCARRIAGE OF JUSTICE
WITH REGARD TO THE CHARGES IN CASE NUMBER 3207 OF 1997.**

While finding that the evidence presented through the habeas proceedings did establish that no reasonable juror would have voted to convict Jim of the charges in case number 3206 of 1997 had that evidence been produced at trial, the Magistrate found the same could not be said of the charges in case number 3207 of 1997. (Second R and R p. 25) The Magistrate reached this conclusion in the belief that the only way the juvenile court records could have been used at Jim's trial with respect to the charges in case number 3207 of 1997 (Jim sexually assaulting Jennifer from May 13 through August 8, 1997) was to impeach Jennifer's testimony concerning how long the abuse had been occurring. (Id.) While the records could have been used for this purpose, as will be discussed below, of greater importance is the fact that the records could have been used to establish **that the Commonwealth's expert medical testimony established that someone other than Jim sexually assaulted Jennifer.** This use of the records, coupled with the impeachment of Jennifer's testimony, would have prevented any reasonable juror from finding Jim guilty beyond a reasonable doubt on the charges in case number 3207 of 1997.

Dr. Schober examined Jennifer on September 12, 1997. (Petitioner's Exhibit G p. 57) Dr. Schober identified three scars that she felt were the results of injuries sustained from attempted penile penetration. Dr. Schober testified that the most recent injury to Jennifer's hymen was still very red and irritated which meant it had been suffered within "a few weeks." (Petitioner's Exhibit G. at 63). From Hermitage House's records, it is clear that the last time Jim could have possibly assaulted Jennifer was the weekend of July 25th and 27th, 1997, **over six weeks** before Dr. Schober examined Jennifer. It was impossible for Jim to have caused that

injury to Jennifer's hymen.

Dr. Schober also testified that one of the scars was at least six months old if not older. (Petitioner's Exhibit G at 61, 63) Dr. Schober examined Jennifer on September 12, 1997. Accordingly, the injury that caused this scar would have had to have occurred by at least March of 1997. Jim's first home visit to Karen's house at 931 West 27th Street was on May 9, 1997. (Petitioner's Exhibit UU)[2] Again, the Hermitage House records and the medical evidence shows that it was impossible for Jim to have caused that injury to Jennifer's hymen.

The third injury to Jennifer's hymen could not be dated. Thus, the evidence concerning this injury was entirely neutral.

Based on Dr. Schober's testimony and the records from Hermitage House, it was impossible for Jim to have created two of the three injuries to Jennifer's hymen. The conclusion is obvious - someone other than Jim was assaulting Jennifer. It is tragic that this inescapable conclusion was not reached at Jim's trial, for when pressed by Judge Anthony as to why Jennifer would falsely accuse him, Jim responded "[w]ell, the only thing I could think is if somebody else has touched her wrong or messed with her, she's covering it up for somebody else, her brothers maybe. I don't know. I can't say." (Petitioner's Exhibit G at 54-55) Jim was right, and his lawyer had access to the evidence that would have proved him right.

The impact the juvenile records had when coupled with Dr. Schober's testimony can not be overstated. This is far more than just impeaching the victim's memory of how long the

---

[2] Jim did have a home visit to Karen's house during the weekend of February 21-23, 1997, while he was at STS. (Petitioner's Exhibit SS) However, at the time of that home visit Karen was living at 1113 Browns Ave., Erie, Pa. Jennifer testified that the assaults occurred in her bedroom at the 931 West 27th Street address. (Petitioner's Exhibit G p. 7-15)

assaults were occurring. The juvenile records from STS and Hermitage House could have been used to show that **the Commonwealth's** evidence proved Jim's innocence. That is a powerful argument.

Of course, the juvenile records could have also been used to impeach Jennifer's testimony. Jennifer testified that Jim had been sexually assaulting her for a year and a half. (Id. at 46) The records from Jim's Erie County Juvenile Probation file prove this to be impossible. Going back in time a year and a half from August 1997 takes us to February 1996. In February 1996, Jim was locked up at the Youth Development Center (YDC) in New Castle, Pa. (Petitioner's Exhibit LL, T. 57) Robert Blakely of Erie County Juvenile Probation explained that there are no home visits from the YDC. (T. 43) Jim remained at the YDC until August 5, 1996 when he was placed at STS. (T. 57, Petitioner's Exhibit LL) Jim's first home visit to Karen and Jennifer's house was during the weekend of February 21-23, 1997. (Petitioner's Exhibit's MM, NN, OO, PP, QQ, RR, SS). But that visit was to the house on Browns Avenue, and Jennifer testified that all of the alleged assaults happened in her bedroom at the 931 West 27th Street address. The first visit Jim had to Jennifer's house on 931 West 27th Street was May 9, 1997. (Petitioner's Exhibit UU) Thus, the very longest Jim could have possibly been assaulting Jennifer was three months, **fifteen months less** than Jennifer claimed. While a juror may not be impressed with a victim's memory not being perfect, having the victim overstate the time frame of the offense by fifteen months would cause any juror to have a reasonable doubt as to the victim's veracity. The Second R and R discounts Jennifer's inaccuracy by stating that she had been advised at trial to limit her testimony to events which occurred between May and August of 1997. (Second R and R p. 25) Jennifer did limit her direct testimony to events that occurred

between May and August of 1997. (Petitioner's Exhibit G. pp. 5-35)  However, Jennifer was recalled by the Commonwealth to give testimony about the abuse which occurred **prior** to May 1997.  (Petitioner's Exhibit G, p. 45-47) While recalled, Jennifer testified that Jim had been sexually assaulting her, in total, for a year and a half.  (Id. at 46) Jennifer also explained that she had not testified about the abuse that occurred before Jim's eighteenth birthday during her first testimony because the prosecutor had told her not to "[b]ecause it didn't count in this trial."  (Id. at 47).  Thus, contrary to the Magistrate's finding, Jennifer did testify at trial to the total length of time the sexual assaults had been occurring and put that time frame at a year and a half.

When this Court views all of the evidence it now has before it, and which should have been presented at Jim's trial, and considers whether a reasonable juror who heard all of the evidence would have convicted Jim of the charges in case number 3207 of 1997, only one conclusion can be reached: it is more likely than not that no reasonable juror would have convicted Jim.  That conclusion leads to the finding that Jim suffered a miscarriage of justice as defined in Schlup, and the procedural default of the ineffective assistance of counsel claim with respect to the charges in case number 3207 of 1997 must be excused.

### INEFFECTIVE ASSISTANCE OF COUNSEL

This Court is familiar with Strickland v. Washington's two-part test for determining claims of ineffective assistance of counsel.  To succeed on a Strickland claim a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).  To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  To establish prejudice, a petitioner must only show that "there is a reasonable

probability that but for counsel's unprofessional errors, the result of the proceeding would be different." Id. at 692.

Judge Baxter's Second R and R persuasively establishes why Jim's attorney's failure to obtain the records from Hermitage House fell below an objective standard of reasonableness with respect to the charges in case number 3206 of 1997. (Second R and R pp. 28-31) That reasoning applies with equal force to the charges in case number 3207 of 1997. Indeed, if Attorney Logue should have obtained the records for use in defending the charges in case number 3206 of 1997, he would have been able to use those records in defending the charges in case number 3207 of 1997 as well.

With regard to prejudice, if the Court finds that Jim has established he suffered a miscarriage of justice with regard to the charges in case number 3207 of 1997, that finding would necessitate a finding of prejudice under Strickland. Judge Baxter realized this fact with regard to the charges in case number 3206 of 1997, finding that the prejudice prong of Strickland was satisfied as to the charges in case number 3206 of 1997 "for the same reason that the manifest injustice standard was met." (Second R and R p. 31)

## CONCLUSION

Judge Baxter's Second Report and Recommendation correctly finds that Jim suffered a miscarriage of justice with regard to the charges in case number 3206 of 1997 and that he received ineffective assistance of counsel with regard to those charges. Judge Baxter's Second Report and Recommendation errs in finding that Jim did not suffer a miscarriage of justice with regard to the charges in case number 3207 of 1997. Judge Baxter failed to grasp that the juvenile court records not only would have impeached the victim's testimony concerning the length of

time the assaults had been occurring but also, when coupled with the Commonwealth's expert medical testimony, established that someone other than Jim sexually assaulted victim.

Jim respectfully requests that this Court allow counsel to make oral argument to the Court before it rules on Judge Baxter's Second Report and recommendation.

Respectfully submitted,

/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653